[No. S099822. Mar. 1, 2004.]

CATHOLIC CHARITIES OF SACRAMENTO, INC., Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
DEPARTMENT OF MANAGED HEALTH CARE et al., Real Parties in
Interest.

528

530

COUNSEL

Law Office of James Francis Sweeney, Sweeney & Grant, James F. Sweeney, Eric Grant; Tobin & Tobin, Paul E. Gaspari and Lawrence R. Jannuzzi for Petitioner.

Gaglione, Coleman & Greene, Robert J. Gaglione; and Michael D. Ramsey for Catholic Charities USA as Amicus Curiae on behalf of Petitioner.

Diepenbrock & Costa, Law Offices of Daniel P. Costa, Daniel P. Costa; and William W. Bassett for California Catholic Conference as Amicus Curiae on behalf of Petitioner.

Richard D. Ackerman and Gary G. Kreep for Life Legal Defense Fund as Amicus Curiae on behalf of Petitioner.

Reed & Brown, Stephen W. Reed; Stuart J. Lark and Gregory S. Baylor for Christian Legal Society, Focus on the Family, Family Research Council and Ethics and Religious Liberty Commission of the Southern Baptist Convention as Amici Curiae on behalf of Petitioner.

McNicholas & McNicholas and John P. McNicholas for the Lutheran Church-Missouri Synod, the International Church of the Foursquare Gospel, the Worldwide Church of God and the United States Conference of Catholic Bishops as Amici Curiae on behalf of Petitioner.

Alan J. Reinach; Alan E. Brownstein; Bassi, Martinin & Blum and Fred Blum for California Coalition for the Free Exercise of Religion as Amicus Curiae on behalf of Petitioner.

Sidley & Austin, Sidley Austin Brown & Wood, Jeffrey A. Berman, James M. Harris, Gene C. Schaerr, Michael S. Lee, Rebecca K. Smith and Eric A. Shumsky for Adventist Health, Alliance of Catholic Health Care, Association of Christian Schools International, Catholic Charities of California, Catholic Charities USA, Inc., Loma Linda University and Loma Linda University Medical Center as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Bill Lockyer, Attorney General, Pamela Smith-Steward, Chief Assistant Attorney General, Manuel M. Medeiros and Andrea Lynn Hoch, Assistant Attorneys General, Catherine M. Van Aken, Meg Halloran, Christopher Krueger, Kenneth R. Williams, Kathleen W. Mikkelson, Daniel G. Stone and Timothy M. Muscat, Deputy Attorneys General, for Real Parties in Interest.

Catherine Weiss, Julie Sternberg; Margaret C. Crosby, Ann Brick; Jordan Budd; Rocio L. Cordoba and Mark Rosenbaum for American Civil Liberties Union, American Civil Liberties Union of Northern California, ACLU Foundation of Southern California and American Civil Liberties Union of San Diego and Imperial Counties as Amici Curiae on behalf of Real Parties in Interest.

Rosina K. Abramson, Steven M. Freeman, Tamar Galatzan, Erica Broido; Rachel Zenner; Doug Mirell, Daniel Sokatch; Jerome J. Shestack, Jeffrey P. Sinensky, Kara H. Stein, Danielle A. Samulon; Morrison & Foerster, J. Michael Stusiak, Sunil R. Kulkarni and Felton T. Newell for Anti-Defamation

League, Hadassah, the American Jewish Committee and the Progressive Jewish Alliance as Amici Curiae on behalf of Real Parties in Interest.

Eisen & Johnston Law Corporation, Jay-Allen Eisen and Marian M. Johnston for Assemblymember Robert J. Hertzberg and Senator Jackie Speier as Amici Curiae on behalf of Real Parties in Interest.

Edward Tabash; Ayesha Khan; and Steve K. Green for Americans United for Separation of Church and State as Amicus Curiae on behalf of Real Parties in Interest.

Nancy M. Solomon for California Women's Law Center, California Women Lawyers, Women Lawyers Association of Los Angeles and Queen's Bench Bar Association of the San Francisco Bay Area as Amici Curiae on behalf of Respondent and Real Parties in Interest.

Eve C. Gartner, Donna Lee; Roberta Riley; Lilly Spitz; and Deborah Baumgarten for Planned Parenthood Affiliates of California, California Planned Parenthood Education Fund, All Planned Parenthood Affiliates and Planned Parenthood Federation of America as Amici Curiae on behalf of Respondent and Real Parties in Interest.

Catherine I. Hanson and Astrid G. Meghrigian for the American College of Obstetricians and Gynecologists and the California Medical Association as Amici Curiae on behalf of Respondent and Real Parties in Interest.

McCutchen, Doyle, Brown & Enersen, Beth H. Parker and Alison R. Beck for Catholics for a Free Choice, California Catholics for a Free Choice, Catholics Speak Out, Dignity/USA, Vermont Catholics for a Free Conscience, Women's Alliance for Theology, Ethics and Ritual, and Women's Ordination Conference as Amici Curiae on behalf of Respondent and Real Parties in Interest.

Bebe J. Anderson; Farella Braun & Martel, Claudia A. Lewis, Sarah L. Kowalski; and Ronora Pawelko for the California Abortion and Reproductive Rights Action League, the CARAL Pro-Choice Education Fund, the Center for Reproductive Law and Policy, the Education Fund of Family Planning Advocates of New York State, Inc., and National Women's Law Center as Amici Curiae on behalf of Respondent and Real Parties in Interest.

Christyne L. Neff and Barry Broad for International Union, AFL-CIO & CLC, Coalition of Labor Union Women, Service Employees International Union, Local 535, and California Nurses Association as Amici Curiae on behalf of Respondent and Real Parties Interest.

## OPINION

**WERDEGAR, J.**—In this case, we address a church-affiliated employer's constitutional challenges to the Women's Contraception Equity Act (WCEA),[1] under which certain health and disability insurance contracts must cover prescription contraceptives. The plaintiff employer, which opposes contraceptives on religious grounds, claims the statute violates the establishment and free exercise clauses of the United States and California Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4.) The lower courts rejected the employer's claims. We affirm.

### I. FACTS

The Legislature enacted the WCEA in 1999 to eliminate gender discrimination in health care benefits and to improve access to prescription contraceptives. Evidence before the Legislature showed that women during their reproductive years spent as much as 68 percent more than men in out-of-pocket health care costs, due in large part to the cost of prescription contraceptives and the various costs of unintended pregnancies, including health risks, premature deliveries and increased neonatal care. Evidence also showed that, while most health maintenance organizations (HMO's) covered prescription contraceptives, not all preferred provider organization (PPO) and indemnity plans did. As a result, approximately 10 percent of commercially insured Californians did not have coverage for prescription contraceptives.

■ The Legislature chose to address these problems by regulating the terms of insurance contracts. The WCEA does not require any employer to offer coverage for prescription drugs. Under the WCEA, however, certain health and disability insurance plans that cover prescription drugs must cover prescription contraceptives. As an exception, the law permits a "religious employer" to request a policy that includes drug coverage but excludes coverage for "contraceptive methods that are contrary to the religious employer's religious tenets."[2] Health and Safety Code section 1367.25 governs

---

[1] The WCEA comprises two laws, Health and Safety Code section 1367.25 (Stats. 1999, ch. 532) and Insurance Code section 10123.196 (Stats. 1999, ch. 538).

[2] Health and Safety Code section 1367.25, subdivision (b); Insurance Code section 10123.196, subdivision. (d).

group health care service plan contracts;[3] Insurance Code section 10123.196 governs individual and group disability insurance policies.[4]

Plaintiff Catholic Charities of Sacramento, Inc. (hereafter Catholic Charities) is a California nonprofit public benefit corporation. (See Corp. Code,

---

[3] Health and Safety Code section 1367.25 provides:

"(a) Every group health care service plan contract, except for a specialized health care service plan contract, that is issued, amended, renewed, or delivered on or after January 1, 2000, and every individual health care service plan contract that is, amended, renewed, or delivered on or after January 1, 2000, except for a specialized health care service plan contract, shall provide coverage for the following, under general terms and conditions applicable to all benefits:

"(1) A health care service plan contract that provides coverage for outpatient prescription drug benefits shall include coverage for a variety of federal Food and Drug Administration approved prescription contraceptive methods designated by the plan. In the event the patient's participating provider, acting within his or her scope of practice, determines that none of the methods designated by the plan is medically appropriate for the patient's medical or personal history, the plan shall also provide coverage for another federal Food and Drug Administration approved, medically appropriate prescription contraceptive method prescribed by the patient's provider.

"(2) Outpatient prescription benefits for an enrollee shall be the same for an enrollee's covered spouse and covered nonspouse dependents.

"(b) Notwithstanding any other provision of this section, a religious employer may request a health care service plan contract without coverage for federal Food and Drug Administration approved contraceptive methods that are contrary to the religious employer's religious tenets. If so requested, a health care service plan contract shall be provided without coverage for contraceptive methods.

"(1) For purposes of this section, a 'religious employer' is an entity for which each of the following is true:

"(A) The inculcation of religious values is the purpose of the entity.

"(B) The entity primarily employs persons who share the religious tenets of the entity.

"(C) The entity serves primarily persons who share the religious tenets of the entity.

"(D) The entity is a nonprofit organization as described in Section 6033(a)(2)(A)i or iii, of the Internal Revenue Code of 1986, as amended.

"(2) Every religious employer that invokes the exemption provided under this section shall provide written notice to prospective enrollees prior to enrollment with the plan, listing the contraceptive health care services the employer refuses to cover for religious reasons.

"(c) Nothing in this section shall be construed to exclude coverage for prescription contraceptive supplies ordered by a health care provider with prescriptive authority for reasons other than contraceptive purposes, such as decreasing the risk of ovarian cancer or eliminating symptoms of menopause, or for prescription contraception that is necessary to preserve the life or health of an enrollee.

"(d) Nothing in this section shall be construed to deny or restrict in any way the [D]epartment[of Managed Care's] authority to ensure plan compliance with this chapter when a plan provides coverage for prescription drugs.

"(e) Nothing in this section shall be construed to require an individual or group health care services plan to cover experimental or investigational treatments."

[4] Insurance Code section 10123.196 is essentially the same as Health and Safety Code section 1367.26 (see fn. 3, *ante*), except that it regulates disability insurance policies instead of health care service plan contracts. For the sake of convenience, subsequent references to the WCEA will include only the Health and Safety Code.

§ 5110 et seq.) Although independently incorporated, Catholic Charities describes itself as "operated in connection with the Roman Catholic Bishop of Sacramento" and as "an organ of the Roman Catholic Church." The nonprofit corporation "offer[s] a multitude of social services and private welfare programs to the general public, as part of the social justice ministry of the Roman Catholic Church." These services and programs include "providing immigrant resettlement programs, elder care, counseling, food, clothing and affordable housing for the poor and needy, housing and vocational training of the developmentally disabled and the like."

Catholic Charities offers health insurance, including prescription drug coverage, to its 183 full-time employees through group health care plans underwritten by Blue Shield of California and Kaiser Permanente. Catholic Charities does not, however, offer insurance for prescription contraceptives because it considers itself obliged to follow the Roman Catholic Church's religious teachings, because the Church considers contraception a sin, and because Catholic Charities believes it cannot offer insurance for prescription contraceptives without improperly facilitating that sin.

As mentioned, the WCEA permits a "religious employer" to offer prescription drug insurance without coverage for contraceptives that violate the employer's religious tenets. (Health & Saf. Code, § 1367.25, subd. (b).) The act defines a "religious employer" as "an entity for which each of the following is true: [¶] (A) The inculcation of religious values is the purpose of the entity. [¶] (B) The entity primarily employs persons who share the religious tenets of the entity. [¶] (C) The entity serves primarily persons who share the religious tenets of the entity. [¶] (D) The entity is a nonprofit organization as described in Section 6033(a)(2)(A) i or iii, of the Internal Revenue Code of 1986, as amended." (*Ibid.*) The cited provisions of the Internal Revenue Code exempt, from the obligation to file an annual return, "churches, their integrated auxiliaries, and conventions or associations of churches" (26 U.S.C. § 6033(a)(2)(A)(i)) and "the exclusively religious activities of any religious order" (*id.*, § 6033(a)(2)(A)(i) and (iii)).

Catholic Charities does not qualify as a "religious employer" under the WCEA because it does not meet any of the definition's four criteria. (See Health & Saf. Code, § 1367.25, subd. (b)(1)(A)–(D).) The organization candidly acknowledges this in its complaint, offering the following explanation: "The corporate purpose of Catholic Charities is not the direct inculcation of religious values. Rather, [its] purpose . . . is to offer social services to the general public that promote a just, compassionate society that supports the dignity of individuals and families, to reduce the causes and results of poverty, and to build healthy communities through social service programs such as counseling, mental health and immigration services, low-income

housing, and supportive social services to the poor and vulnerable. Further, Catholic Charities does not primarily employ persons who share its Roman Catholic religious beliefs, but, rather, employs a diverse group of persons of many religious backgrounds, all of whom share [its] Gospel-based commitment to promote a just, compassionate society that supports the dignity of individuals and families. Moreover, Catholic Charities serves people of all faith backgrounds, a significant majority of [whom] do not share [its] Roman Catholic faith. Finally, . . . Catholic Charities, although an exempt organization under 26 U.S.C. § 501(c)(3), is not a nonprofit organization pursuant to [s]ection 6033(a)(2)(A)(i) or (iii) of the Internal Revenue Code of 1986. Consequently, . . . Catholic Charities is not entitled . . . to an exemption from the mandate imposed by [the WCEA]."

As mentioned, the WCEA implicitly permits any employer to avoid covering contraceptives by not offering coverage for prescription drugs. But this option, according to Catholic Charities, does not eliminate all conflict between the law and its religious beliefs. Catholic Charities feels obliged to offer prescription drug insurance to its employees under what it describes as the "Roman Catholic religious teaching" that "an employer has a moral obligation at all times to consider the well-being of its employees and to offer just wages and benefits in order to provide a dignified livelihood for the employee and his or her family."

Perceiving no option consistent with both its beliefs and the law, Catholic Charities filed this action seeking a declaratory judgment that the WCEA is unconstitutional and an injunction barring the law's enforcement. Defendants are the State of California, the Department of Managed Health Care and the Department of Insurance.[5] Catholic Charities' challenges to the WCEA arise under the establishment and free exercise clauses of the United States and California Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4.) The superior court, finding no reasonable likelihood that Catholic Charities would prevail on the merits, denied its motion for a preliminary injunction. Catholic Charities sought review of this ruling by petition for writ of mandate, which the Court of Appeal denied. We granted review of the Court of Appeal's decision.

## II. Discussion

Catholic Charities, in its brief to this court, asserts eight constitutional challenges to the WCEA. All refer to the religion clauses of the federal and

---

[5] The Department of Managed Health Care regulates health care service plans. (Health & Saf. Code, § 1341 et seq.) The Department of Insurance and the Insurance Commissioner regulate disability insurance policies. (See *id.*, § 1343, subd. (e)(1), and Ins. Code, § 10290 et seq.)

state Constitutions. (U.S. Const., 1st Amend.;Cal. Const., art. I, § 4.) Catholic Charities begins with a set of three arguments to the effect that the WCEA impermissibly interferes with the autonomy of religious organizations. (See p. 541 et seq., *post.*) Next, Catholic Charities claims the WCEA impermissibly burdens its right of free exercise. As part of this claim, Catholic Charities offers four arguments for subjecting the WCEA to strict scrutiny, despite the United States Supreme Court's holding that the right of free exercise does not excuse compliance with neutral, generally applicable laws. (*Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 876–890 [108 L.Ed.2d 876, 110 S.Ct. 1595]; see p. 547 et seq., *post.*) Finally, Catholic Charities contends the WCEA fails even the rational basis test. (See p. 566 et seq., *post.*)

### A. Religious Autonomy

#### 1. Interference with matters of religious doctrine and internal church governance

■ Catholic Charities contends the WCEA impermissibly interferes with matters of religious doctrine and internal church governance. In support of the contention, Catholic Charities invokes the rule that the state must accept the decision of appropriate church authorities on such matters. This is the rule of the so-called church property cases. (E.g., *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 708–709 [49 L.Ed.2d 151, 96 S.Ct. 2372]; *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 445–449 [21 L.Ed.2d 658, 89 S.Ct. 601]; *Kreshik v. St. Nicholas Cathedral* (1960) 363 U.S. 190, 191 [4 L.Ed.2d 1140, 80 S.Ct. 1037]; *Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94, 109–121 [97 L.Ed. 120, 73 S.Ct. 143]; *Gonzalez v. Archbishop* (1929) 280 U.S. 1, 16–17 [74 L.Ed. 131, 50 S.Ct. 5]; *Watson v. Jones* (1871) 80 U.S. 679, 727 [20 L.Ed. 666].) That rule does not dispose of this case.

■ The first church property case to reach the United States Supreme Court, *Watson v. Jones, supra,* 80 U.S. 679 (*Watson*), articulates the rule and illustrates its proper application. The case arose from a schism in the Presbyterian Church during the Civil War. When the church's national governing body, the General Assembly, expressed its opposition to slavery, various congregations responded by declaring the General Assembly's view heretical and renouncing that body's authority. The General Assembly, in turn, dissolved the schismatic congregations. Civil disputes ensued between rival congregations, each asserting a religious claim to be the only true congregation entitled to use certain local church property. The high court resolved the competing religious claims by deferring to the decision of the General Assembly, thus adopting the rule still in effect today: "[W]henever . . . questions of discipline, or of faith, or ecclesiastical rule, custom, or

law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Id.*, at p. 727.) The rule's modern formulation is similar. (*Serbian Orthodox Diocese v. Milivojevich, supra*, 426 U.S. 696, 709.)

The high court in *Watson, supra*, 80 U.S. 679, offered two reasons for deferring to religious authorities on religious questions. The first justification was that civil courts are simply "incompetent" to decide matters of faith and doctrine. (*Id.*, at p. 732.) Courts have no expertise in religious matters, and courts "so unwise" as to attempt to decide them "would only involve themselves in a sea of uncertainty and doubt . . . ." (*Ibid.*; see also *Serbian Orthodox Diocese v. Milivojevich, supra*, 426 U.S. 696, 714–715 & fn. 8.) The second reason was that the members of a church, by joining, implictly consent to the church's governance in religious matters; for civil courts to review the church's judgments would "deprive these bodies of the right of construing their own church laws" (*Watson*, at pp. 733–734; see also *id.*, at pp. 728–729) and, thus, impair the right to form voluntary religious organizations (*id.*, at pp. 728–729; cf. *Serbian Orthodox Diocese v. Milivojevich, supra*, at pp. 724–725).

Because *Watson, supra*, 80 U.S. 679, preceded the First Amendment's incorporation into the Fourteenth, the court did not base its decision on the Constitution. In subsequent cases, however, the court has described *Watson*'s reasoning as having a " 'clear constitutional ring' " (*Serbian Orthodox Diocese v. Milivojevich, supra*, 426 U.S. 696, 710, quoting *Presbyterian Church v. Hull Church, supra*, 393 U.S. 440, 446; cf. *Watson*, at pp. 728–729) and *Watson*'s holding as compelled by the religion clauses of the First Amendment (*Serbian Orthodox Diocese v. Milivojevich, supra*, at pp. 724–725; *Kedroff v. St. Nicholas Cathedral, supra*, 344 U.S. 94, 115–116; see also *Employment Div., Ore. Dept. of Human Res. v. Smith, supra*, 494 U.S. 872, 877). The high court has also held that legislatures are bound by the same constitutional limitations *Watson* articulated for the courts. (*Kedroff v. St. Nicholas Cathedral, supra*, at pp. 117–121.)

■ Catholic Charities asserts that the Legislature, in enacting the WCEA, violated the rule of the church property cases by interfering with matters of internal church governance and by rejecting the Catholic Church's decision that prescription contraceptives are sinful. These assertions are incorrect. This case does not implicate internal church governance; it implicates the relationship between a nonprofit public benefit corporation and its employees, most of whom do not belong to the Catholic Church. Only those who join a church impliedly consent to its religious governance on matters of faith and discipline. (*Watson, supra*, 80 U.S. 679, 729.) Certainly the WCEA conflicts with

Catholic Charities' religious beliefs, but this does not mean the Legislature has decided a religious question. Congress has created, and the high court has resolved, similar conflicts between employment law and religious beliefs without deciding religious questions and without reference to the church property cases. (E.g., *Tony and Susan Alamo Foundation v. Sec'y of Labor* (1985) 471 U.S. 290, 303–306 [85 L.Ed.2d 278, 105 S.Ct. 1953] [religious organization must comply with federal minimum wage laws]; *United States v. Lee* (1982) 455 U.S. 252, 256–261 [71 L.Ed.2d 127, 102 S.Ct. 1051] [Amish employer must pay Social Security and unemployment taxes].) Neither does this case require us to decide any religious questions. Instead, we need only apply the usual rules for assessing whether state-imposed burdens on religious exercise are constitutional. (See *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520, 531–533 [124 L.Ed.2d 472, 113 S.Ct. 2217]; *Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. 872, 876–882.) This we do below, in the context of Catholic Charities' separate claims under the free exercise clause. (See p. 547 et seq., *post.*)

Catholic Charities also argues the Legislature, by enacting the WCEA, deliberately intervened in a conflict within the Catholic Church on the side of those who disagree with the Church's teachings on contraception. In support of the argument, Catholic Charities notes that one of WCEA's sponsors cited, on the floor of the state Senate, a New York Times poll suggesting that not all Catholic women accept the Church's teachings on contraception, and that "someone who practices artificial birth control can still be a good Catholic." Commenting on the poll, the senator said, "I agree with that. I think it's time to do the right thing." Certainly the state may not "lend its power to one or the other side in controversies over religious authority or dogma . . . ." (*Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. 872, 877.) However, the Legislature's motivation cannot reliably be inferred from a single senator's remarks. Other legislators who voted to enact the WCEA might well have done so because they wished to reduce the inequitable financial burden of health care on women, without regard to any religious dispute over the propriety of artificial contraception.

While the church property cases thus do not invalidate the WCEA, the constitutional principles that underlie those cases may place an outer limit on the statute's constitutional application. Relying on the church property cases, lower federal courts have held that the First Amendment bars courts from reviewing employment decisions by religious organizations affecting employees who have the religious duties of ministers. (*McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553, 558–561; see also *Gellington v. Christian Methodist Episcopal Church* (11th Cir. 2000) 203 F.3d 1299, 1301–1304; *Combs v. Cen Tx Ann Conf United Methodist Church* (5th Cir. 1999) 173 F.3d 343, 345–350.) The rule that emerges from these decisions is sometimes called the "ministerial exception," because it operates as a nonstatutory,

constitutionally compelled exception to title VII of the Civil Rights Act of 1964. (42 U.S.C. § 2000e et seq., hereafter title VII.)

The Fifth Circuit first recognized the ministerial exception in *McClure v. Salvation Army, supra,* 460 F.2d 553. The plaintiff, a former officer of the Salvation Army, alleged that her termination was motivated by sex discrimination violating title VII. To avoid doubts about title VII's constitutionality as applied to religious organizations, the court construed the law as not governing the relationship between a church and its ministers. Judicial review of a minister's salary and duties, the court reasoned, would "intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern." (*McClure v. Salvation Army, supra,* at p. 560.) Although the United States Supreme Court has not spoken on the ministerial exception, the lower federal courts have widely embraced it, applying it both to ministers and to a variety of nonordained employees with duties functionally equivalent to those of ministers. (E.g., *Alicea-Hernandez v. Catholic Bishop of Chicago* (7th Cir. 2003) 320 F.3d 698, 700–704 [Hispanic communications manager for Archdiocese of Chicago, responsible for "shaping the message that the Church presented to the Hispanic community"]; *E.E.O.C. v. Roman Catholic Diocese of Raleigh, NC* (4th Cir. 2000) 213 F.3d 795, 802–805 [cathedral choir director required to assist in planning liturgies]; *E.E.O.C. v. Catholic University of America* (D.C. Cir. 1996) 317 U.S. App. D.C. 343 [83 F.3d 455, 461] [professor of canon law at religious university].)

Because the case before us does not involve title VII, the ministerial exception as currently articulated does not apply. Although the constitutional reasoning underlying the ministerial exception might bar the state from applying the WCEA to ministers or clergy employed by a bona fide religious organization that for whatever reason did not qualify under the act's exemption for religious organizations (Health & Saf. Code, § 1367.25, subd. (b); cf. *Schmoll v. Chapman University* (1999) 70 Cal.App.4th 1434, 1438–1444 [83 Cal.Rptr.2d 426] [recognizing a ministerial exception to the Cal. Fair Employment and Housing Act, Gov. Code, § 12900 et seq.]), we need not decide the question because Catholic Charities does not claim that any of its employees have the religious duties of ministers. Indeed, as noted above, most are not even members of the Catholic Church. In short, the ministerial exception does not dispose of this case. Catholic Charities acknowledges as much.

## 2. *Distinction between religious and secular activities*

Catholic Charities next argues that the First Amendment forbids the government to "premis[e] a religious institution's eligibility for an exemption

from government regulation upon whether the activities of the institution are deemed by the government to be 'religious' or 'secular' . . . ." The argument is directed against the four statutory criteria an employer must satisfy to claim exemption from the WCEA as a "religious employer." (Health & Saf. Code, § 1367.25, subd. (b)(1)(A)–(D); see p. 539, *ante*.) The argument lacks merit.

■ The exception to the WCEA accommodates religious exercise by relieving statutorily defined "religious employers" (Health & Saf. Code, § 1367.25, subd. (b)) of the burden of paying for contraceptive methods that violate their religious beliefs. ■ The United States Supreme Court has long recognized that the alleviation of significant governmentally created burdens on religious exercise is a permissible legislative purpose that does not offend the establishment clause. (*Corporation of Presiding Bishop v. Amos* (1978) 483 U.S. 327, 334–335 [97 L.Ed.2d 273, 107 S.Ct. 2862]; *Hobbie v. Unemployment Appeals Comm'n of Fla.* (1987) 480 U.S. 136, 144–145 [94 L.Ed.2d 190, 107 S.Ct. 1046]; cf. *Employment Div., Ore. Dept. of Human Res. v. Smith, supra*, 494 U.S. 872, 890.) Such legislative accommodations would be impossible as a practical matter if the government were, as Catholic Charities argues, forbidden to distinguish between the religious entities and activities that are entitled to accommodation and the secular entities and activities that are not. In fact, Congress and the state legislatures have drawn such distinctions for this purpose, and laws embodying such distinctions have passed constitutional muster. (E.g., *Corporation of Presiding Bishop v. Amos, supra*, 483 U.S. 327, 334–340 [upholding statutory exemption of "religious" employers from liability for religious discrimination; 42 U.S.C. § 2000e-1(a)]; *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 704–718 [102 Cal.Rptr.2d 280, 13 P.3d 1122] [upholding state laws exempting "religiously affiliated" organizations from landmark preservation laws; Gov. Code, §§ 25373, subds. (c) & (d), 37361, subd. (c)].)

Catholic Charities' argument to the contrary largely depends on a single lower federal court decision, *Espinosa v. Rusk* (10th Cir. 1980) 634 F.2d 477 (*Espinosa*). In that case, the court invalidated an antisolicitation ordinance because, among other things, it "involve[d] municipal officials in the definition of what is religious." (*Id.*, at p. 481.) But whatever *Espinosa* might purport to hold, the decision could not supersede the United States Supreme Court's repeated holding that the government may constitutionally exempt religious organizations from generally applicable laws in order to alleviate significant governmentally imposed burdens on religious exercise. (*Corporation of Presiding Bishop v. Amos, supra*, 483 U.S. 327, 334–335; *Hobbie v. Unemployment Appeals Comm'n of Fla., supra*, 480 U.S. 136, 144–145; cf. *Employment Div., Ore. Dept. of Human Res. v. Smith, supra*, 494 U.S. 872, 890.) In any event, the court in *Espinosa* addressed the different problem of

content-based prior restraints on speech. The court struck down an ordinance that gave municipal officials, in effect, the power to decide in advance which messages the city's residents would be permitted to hear by requiring the officials, before granting a permit, to determine that the applicant's purpose for soliciting funds was truly religious. The ordinance thus violated *Cantwell v. Connecticut* (1940) 310 U.S. 296, 305–307 [84 L.Ed. 1213, 60 S.Ct. 900], which permits the government to regulate the time, place and manner of religious solicitations but not to censor them altogether based on an assessment of the content of speech. (*Espinosa*, at pp. 480–482.) The WCEA, which places no restrictions on speech, does not present the problem addressed in *Cantwell v. Connecticut* and *Espinosa*.

Our conclusion that the government may properly distinguish between secular and religious entities and activities for the purpose of accommodating religious exercise does not mean that any given statute purporting to draw such distinctions necessarily passes muster under the free exercise clause. "[A] law targeting religious beliefs as such is never permissible," and a court " 'must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.' " (*Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra*, 508 U.S. 520, 533–534, quoting *Walz v. Tax Commission* (1970) 397 U.S. 664, 696 [25 L.Ed.2d 697, 90 S.Ct. 1409] (conc. opn. of Harlan, J.).) We address below Catholic Charities' separate argument that the WCEA's definition of "religious employer" in fact embodies a legislative effort to target Catholic organizations for unfavorable treatment. (See p. 552 et seq., *post.*)

### 3. *Excessive entanglement*

■ Catholic Charities contends that the WCEA's exemption for "religious employer[s]" (Health & Saf. Code, § 1367.25, subd. (b)) violates the establishment clause by mandating an entangling inquiry into the employer's religious purpose and into its employees' and clients' religious beliefs. The argument refers to the first three of the four statutory criteria for identifying a "religious employer," namely, whether "[t]he inculcation of religious values is the purpose of the entity" (*id.*, subd. (b)(1)(A)), whether "[t]he entity primarily employs persons who share the religious tenets of the entity" (*id.*, subd. (b)(1)(B)), and whether "[t]he entity serves primarily persons who share the religious tenets of the entity" (*id.*, subd. (b)(1)(C)). A law that fosters an excessive governmental entanglement with religion can for that reason violate the establishment clause. (*Lemon v. Kurtzman* (1971) 403 U.S. 602, 612–613 [29 L.Ed.2d 745, 91 S.Ct. 2105].)[6] Moreover, recent judicial

---

[6] The court in *Lemon v. Kurtzman, supra*, 403 U.S. 602, "gleaned from [its prior] cases" three tests for determining whether a statute violates the establishment clause: "First, the statute must have a secular legislative purpose; second its principal or primary effect must be

opinions have criticized rules and laws that invite official "trolling through a person's or institution's religious beliefs." (*Mitchell v. Helms* (2000) 530 U.S. 793, 828 [147 L.Ed.2d 660, 120 S.Ct. 2530] (plur. opn. of Thomas, J.); *University of Great Falls v. N.L.R.B.* (D.C. Cir. 2002) 349 U.S. App. D.C. 386 [278 F.3d 1335, 1342–1348].)

 The argument might have merit as applied to a hypothetical employer that sought to qualify under the WCEA's exemption for religious employers (Health & Saf. Code, § 1367.25, subd. (b)) but objected on establishment clause grounds to an entangling official effort to verify that its purpose was the inculcation of religious values, and that it primarily employed and served persons who shared its religious tenets. But Catholic Charities candidly alleges in its complaint that it does not qualify under the exemption because it does not satisfy any of the four criteria. More specifically, Catholic Charities concedes that its purpose is not the inculcation of religious values, that it does not primarily hire and serve Catholics, and that it does not fall within either of the relevant provisions of the Internal Revenue Code (26 U.S.C. § 6033(a)(2)(A)(i) and (iii), cited in Health & Saf. Code, § 1367.25, subd. (b)(1)(D)). Consequently, no entangling inquiry into Catholic Charities' purpose or beliefs, or the beliefs of its employees and clients, has occurred or is likely to occur. Therefore, even if in some other case the statute might require an entangling inquiry, in this case, as applied to Catholic Charities, the establishment clause offers no basis for holding the statute unconstitutional.

### B. *Free Exercise of Religion*

Catholic Charities argues the WCEA violates the free exercise clauses of the federal and state Constitutions (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4) by coercing the organization to violate its religious beliefs, in that the WCEA, by regulating the content of insurance policies, in effect requires employers who offer their workers insurance for prescription drugs to offer coverage for prescription contraceptives. Catholic Charities wishes to offer insurance, but may not facilitate the use of contraceptives without violating its religious beliefs.

 Any analysis of Catholic Charities' free exercise claim must take into consideration the United States Supreme Court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith, supra,* 494 U.S. 872 (*Smith*). In *Smith,* the high court articulated the general rule that religious beliefs do not excuse compliance with otherwise valid laws regulating matters the state is free to regulate. (*Id.,* at pp. 877–882.) The government may not

---

one that neither advances nor inhibits religion . . . ; finally, the statute must not foster 'an excessive governmental entanglement with religion.' " (*Id.,* at pp. 612–613, quoting *Walz v. Tax Commission, supra,* 397 U.S. 664, 674.)

regulate religious beliefs as such by compelling or punishing their affirmation. (*Id.*, at p. 877.) Nor may it target conduct for regulation only because it is undertaken for religious reasons. (*Ibid.*) But "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " (*Smith*, at p. 879, quoting *United States v. Lee, supra*, 455 U.S. 252, 263, fn. 3 (conc. opn. of Stevens, J.).) To permit religious beliefs to excuse acts contrary to law, the *Smith* court reasoned, " 'would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.' " (*Smith*, at p. 879, quoting *Reynolds v. United States* (1879) 98 U.S. 145, 167 [25 L.Ed. 244].)

Before *Smith, supra*, 494 U.S. 872, the high court had taken a variety of approaches to assessing the constitutionality of laws claimed to burden the free exercise of religion. In some cases, notably *Sherbert v. Verner* (1963) 374 U.S. 398, 403–409 [10 L.Ed.2d 965, 83 S.Ct. 1790] (*Sherbert*) and *Wisconsin v. Yoder* (1972) 406 U.S. 205, 220–229 [32 L.Ed.2d 15, 92 S.Ct. 1526], the court had examined such laws under strict scrutiny, reasoning that a law substantially burdening religious practice must be narrowly tailored to serve a compelling state interest. In other cases, both before and after *Sherbert*, the court had upheld laws and governmental actions challenged under the free exercise clause without applying strict scrutiny.[7]

Eight years before *Smith, supra*, 494 U.S. 872, Justice Stevens wrote that most of the court's holdings were better explained not by the strict scrutiny test of *Sherbert, supra*, 374 U.S. 398, but by "a standard that places an almost insurmountable burden on any individual who objects to a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes) . . . ." (*United States v. Lee, supra*, 455 U.S. 252, 263, fn. 3 (conc. opn. of Stevens, J.).) After *Lee*, the court again upheld laws claimed to burden free exercise, either without mentioning *Sherbert*, or while mentioning *Sherbert* but declining to

---

[7] *Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439 [99 L.Ed.2d 534, 108 S.Ct. 1319] (Native American free exercise challenge to governmental logging and road construction activities); *O'Lone v. Estate of Shabazz* (1987) 482 U.S. 342 [96 L.Ed.2d 282, 107 S.Ct. 2400] (prison regulations); *Goldman v. Weinberger* (1986) 475 U.S. 503 [89 L.Ed.2d 478, 106 S.Ct. 1310] (military dress regulations); *Gillette v. United States* (1971) 401 U.S. 437 [28 L.Ed.2d 168, 91 S.Ct. 828] (selective service law); *Braunfeld v. Brown* (1961) 366 U.S. 599 [6 L.Ed.2d 563, 81 S.Ct. 1144] (Sunday closing law); *Prince v. Massachusetts* (1944) 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438] (child labor law); *Jacobson v. Massachusetts* (1905) 197 U.S. 11 [49 L.Ed. 643, 25 S.Ct. 358] (compulsory vaccination law); *Reynolds v. United States, supra*, 98 U.S. 145 (polygamy law).

apply its test.[8] This inconsistency ended with *Smith*, in which the high court repudiated the *Sherbert* test and expressly adopted the standard Justice Stevens had articulated. (*Smith*, at pp. 879, 882–890.) More recently, the court has reaffirmed *Smith* and reiterated "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." (*Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra*, 508 U.S. 520, 531.)

The general rule affirmed in *Smith, supra*, 494 U.S. 872, would at first glance appear to dispose of Catholic Charities' free exercise claim. The WCEA's requirements apply neutrally and generally to all employers, regardless of religious affiliation, except to those few who satisfy the statute's strict requirements for exemption on religious grounds. (Health & Saf. Code, § 1367.25, subd. (b).) The act also addresses a matter the state is free to regulate; it regulates the content of insurance policies for the purpose of eliminating a form of gender discrimination in health benefits. The act conflicts with Catholic Charities' religious beliefs only incidentally, because those beliefs happen to make prescription contraceptives sinful. Accordingly, it appears Catholic Charities may successfully challenge the WCEA only by demonstrating an exception to the general rule.

To demonstrate an exception to the general rule is, in fact, precisely what Catholic Charities seeks to do. On four separate grounds, Catholic Charities argues we should examine the WCEA under strict scrutiny despite the holding of *Smith, supra*, 494 U.S. 872. Specifically, Catholic Charities argues that the WCEA is not neutral and generally applicable (see *Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra*, 508 U.S. 520, 533–547), that it constitutes a religious "gerrymander" (see *id.*, at p. 534), and that it violates so-called hybrid rights (cf. *Smith, supra*, 494 U.S. at pp. 881–882). Finally, Catholic Charities argues that the California Constitution requires us to apply strict scrutiny in any event, and that the WCEA fails that test. We address each of these arguments below.

---

[8] *Lyng v. Northwest Indian Cemetery Prot. Assn., supra*, 485 U.S. 439, 450–453; *O'Lone v. Estate of Shabazz, supra*, 482 U.S. 342, 348–353; *Goldman v. Weinberger, supra*, 475 U.S. 503, 506–510.

In *Bowen v. Roy* (1986) 476 U.S. 693 [90 L.Ed.2d 735, 106 S.Ct. 2147], the high court did not decide whether the free exercise clause barred the federal government from requiring Native American welfare applicants, over their religious objections, to provide Social Security numbers. In separate opinions, six justices expressed the view that *Sherbert* would govern the question. (*Id.*, at pp. 715–716 (opn. of Blackmun, J., conc. in part); *id.*, at p. 722 & fn. 17 (opn. of Stevens, J., conc. in part); *id.*, at p. 728 (opn. of O'Connor, J., conc. in part, with Brennan and Marshall, JJ., conc.); *id.*, at p. 733 (dis. opn. of White, J.).) Three justices disagreed. (*Id.*, at p. 708 (plur. opn. of Burger, C. J., with Powell and Rehnquist, JJ., conc.).)

## 1. *Neutrality and general applicability*

Catholic Charities offers two arguments why the WCEA should be not considered neutral or generally applicable and should, thus, be subject to strict scrutiny under an exception to the rule of *Smith, supra,* 494 U.S. 872. First, Catholic Charities contends the face of the statute demonstrates a lack of neutrality; second, Catholic Charities relies on the WCEA's legislative history and practical effect to argue the Legislature "gerrymandered" the law to reach only Catholic employers. We address these arguments separately, as Catholic Charities has stated them in its brief.

A law is not neutral towards religion if its "object . . . is to infringe upon or restrict practices because of their religious motivation . . . ." (*Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra,* 508 U.S. 520, 533 (*Lukumi*).) A law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief . . . ." (*Id.,* at p. 543.) Thus, "[n]eutrality and general applicability are interrelated, and . . . [a] failure to satisfy one requirement is a likely indication that the other has not been satisfied." (*Id.,* at p. 531.)

In determining whether the object of a law is to suppress religion or religiously motivated conduct, a court "must begin with [the law's] text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." (*Lukumi, supra,* 508 U.S. 520, 533.) Following this approach, the high court in *Lukumi* found that a city council's use of the words "sacrifice" and "ritual" in an ordinance regulating animal slaughter helped to show, together with other evidence, that the ordinance had been motivated by a desire to suppress the Santeria religion. The lack of facial neutrality fit into a "pattern" of "animosity to Santeria adherents and their religious practices . . . ." (*Id.,* at p. 542.) Not only did "the ordinances by their own terms target [Santeria] religious exercise," so too were "the texts of the ordinances . . . gerrymandered with care to proscribe religious killings of animals but to exclude almost all secular killings . . . ." (*Ibid.*) Finally, "the ordinances suppress[ed] much more religious conduct than [was] necessary in order to achieve the legitimate ends asserted in their defense [i.e., protecting health and preventing cruelty to animals]." (*Ibid.*)

Relying on *Lukumi, supra,* 508 U.S. 520, Catholic Charities argues the WCEA is not neutral because its exemption for religious employers contains religious terms and terminology that lack any secular meaning or purpose. Catholic Charities specifically refers to the terms "inculcation of religious values" and "religious tenets," both of which appear in criteria used in the

WCEA to define and exempt "religious employer[s]." (Health & Saf. Code, § 1367.25, subd. (b)(1)(A), (B) & (C).)

*Lukumi, supra*, 508 U.S. 520, is inapposite. The animal sacrifice ordinance challenged in that case referred to religious practices ("sacrifice" and "ritual") in order to *prohibit* them. In that context, the statute's use of religious terminology supported the court's conclusion "that suppression of the central element of the Santeria worship service was the object of the ordinances" there at issue. (*Id.*, at p. 534.) In contrast, the WCEA refers to the religious characteristics of organizations in order to identify and *exempt* those organizations from an otherwise generally applicable duty. Although Catholic Charities cannot claim the statutory exemption for religious employers, other Catholic organizations may be able to claim it. If the WCEA burdens Catholic Charities' religious beliefs, the burden arises not from the religious terminology used in the exemption, but from the generally applicable requirement to provide coverage for contraceptives. The high court has never prohibited statutory references to religion for the purpose of accommodating religious practice. To the contrary, the court has repeatedly indicated that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." (*Corporation of Presiding Bishop v. Amos, supra*, 483 U.S. 327, 335 (*Amos*); see also *Hobbie v. Unemployment Appeals Comm'n of Fla., supra*, 480 U.S. 136, 144–145; cf. *Smith, supra*, 494 U.S. 872, 890.) Furthermore, the state may require an organization "claiming the benefits of [a] religious-organization exemption" from a regulatory statute "to *prove* that [it] is a religious organization within the meaning of the [statute]." (*Larson v. Valente* (1982) 456 U.S. 228, 255, fn. 30 [72 L.Ed.2d 33, 102 S.Ct. 1673], italics added.) To accomplish these purposes without explicitly defining the religious groups and practices to be accommodated, in order to distinguish them from secular groups and practices not entitled to accommodation, would often be impossible.

██ Because a legislative accommodation benefits religion, it is tested not under the free exercise clause but under the establishment clause. (*Amos, supra*, 483 U.S. 327, 334–336.) To comply with the establishment clause, a law must among other things serve a " 'secular legislative purpose.' " (*Id.*, at p. 335, quoting *Lemon v. Kurtzman, supra*, 403 U.S. 602, 612.) In this context, the requirement of a secular legislative purpose "does not mean that the law's purpose must be unrelated to religion—that would amount to a requirement 'that the government show a callous indifference to religious groups,' . . . and the Establishment Clause has never been so interpreted." (*Amos*, at p. 335, quoting *Zorach v. Clauson* (1952) 343 U.S. 306, 314 [96 L.Ed. 954, 72 S.Ct. 679].) Instead, "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." (*Amos*, at

p. 335.) The references to religion in the WCEA have no other purpose than this. The high court has not "required that legislative categories make no explicit reference to religion." (*Texas Monthly, Inc. v. Bullock* (1989) 489 U.S. 1, 10 [103 L.Ed.2d 1, 109 S.Ct. 890] (plur. opn. of Brennan, J.).)

A rule barring religious references in statutes intended to relieve burdens on religious exercise would invalidate a large number of statutes. A few examples suffice. The federal statute upheld in *Amos, supra,* 483 U.S. 327, for example, exempted from title VII "a religious corporation, association, or educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such a corporation, association, educational institution, or society of its activities." (42 U.S.C. § 2000e-1(a).) Similarly, the California Fair Employment and Housing Act uses the term "religious association or corporation" (Gov. Code, § 12926, subd. (d)) in order to exempt certain employers from liability for unlawful employment practices. We recently upheld statutes that refer to "religiously affiliated" associations and their "religious mission[s]" for the purpose of exempting such associations from burdens imposed by a landmark preservation ordinance. (*East Bay Asian Local Development Corp. v. State of California, supra,* 24 Cal.4th 693, 702, quoting Gov. Code, §§ 25373, subd. (d), and 37361, subd. (c).) The rule Catholic Charities proposes would invalidate these and many similar laws. Because the high court's decisions provide no support for such a rule, we reject it.

## 2. *Religious gerrymander*

■ Our analysis does not end with the conclusion that the WCEA is facially neutral towards religion. The First Amendment requires more than facial neutrality. It protects against " 'subtle departures from neutrality' " and "governmental hostility which is masked as well as overt." (*Lukumi, supra,* 508 U.S. 520, 534, quoting *Gillette v. United States, supra,* 401 U.S. 437, 452.) Thus, a court " 'must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.' " (*Ibid.,* quoting *Walz v. Tax Commission, supra,* 397 U.S. 664, 696 (conc. opn. of Harlan, J.).) Catholic Charities argues the Legislature gerrymandered the WCEA to deny the benefit of the exemption to Catholic organizations. The law discriminates, Catholic Charities contends, both against the Catholic Church and against religious organizations of any denomination that engage in charitable work, as opposed to work that is purely spiritual or evangelical.

■ We find no merit in the argument that the WCEA discriminates against the Catholic Church. It was at the request of Catholic organizations that the Legislature added an exception permitting religious employers to deny

coverage for "contraceptive methods that are contrary to the religious employer's religious tenets." (Health & Saf. Code, § 1367.25, subd. (b).) Because most religions do not object to prescription contraceptives, most religious employers are subject to the WCEA. The Legislature's decision to grant preferential treatment to religious employers who do object is justifiable as an accommodation of religious exercise under the principles discussed above. (*Amos, supra,* 483 U.S. 327, 334–335.) That the exemption is not sufficiently broad to cover all organizations affiliated with the Catholic Church does not mean the exemption discriminates against the Catholic Church.[9]

We find nothing to the contrary in *Larson v. Valente, supra,* 456 U.S. 228 (*Larson*), the decision on which Catholic Charities principally relies. The high court in *Larson* held unconstitutional under the establishment clause a Minnesota statute that discriminated, in effect, against the Reverend Sun Myung Moon's Unification Church. For many years prior to *Larson,* Minnesota law had regulated charitable solicitations generally but exempted from regulation all solicitations by religious organizations. In 1978, the Minnesota Legislature amended the law to exempt only those religious organizations that received more than 50 percent of their contributions from members or affiliated organizations. Minnesota defended the exemption as intended to prevent abusive solicitations of the public, reasoning that the members of well-established, internally funded churches would exercise enough supervision over fund-raising activities to justify dispensing with state supervision. The high court rejected the argument. In the court's view, the 50-percent rule violated "[t]he clearest command of the Establishment Clause," namely, "that one religious denomination cannot be officially preferred over another." (*Id.,* at p. 244.) Laws granting denominational preferences must serve compelling governmental interests and be closely fitted to further those interests. (*Id.,* at pp. 246–247.) Minnesota's law failed that test.

The reasoning of *Larson, supra,* 456 U.S. 228, does not invalidate the WCEA. The statute invalidated in *Larson* drew an explicit distinction between religious denominations based on their sources of income, and used

---

[9] Indeed, rather than discriminating against the Catholic Church, the WCEA can more plausibly be viewed as benefiting the Catholic Church in practical effect, since no other religious group opposed to prescription contraceptives has been identified. But the WCEA does not for this reason violate the establishment clause. A law intended not to discriminate among religions but to alleviate a governmentally created burden on religious exercise does not necessarily violate the establishment clause, even though only a single religion in need of accommodation has been identified, if the law is phrased neutrally, to allow for the possibility that other as-yet-unidentified religions in need of the same accommodation will be able to claim it. (See, e.g., *Kong v. Scully* (9th Cir. 2003) 341 F.3d 1132; *Children's Health. Is A Legal Duty v. Min De Parle* (8th Cir. 2000) 212 F.3d 1084; *Droz v. Commissioner of I.R.S.* (9th Cir. 1995) 48 F.3d 1120.)

that distinction to impose a regulatory burden only on certain denominations. In contrast, the WCEA applies to religious and nonreligious organizations equally. The WCEA confers the special benefit of exemption only on those religious organizations whose tenets are opposed to prescription contraceptives and that meet the other requirements for exemption. This benefit, as explained above, is justifiable as a legislative accommodation—an effort to alleviate a governmentally imposed burden on religious exercise. (See *Amos, supra*, 483 U.S. 327, 334–335.) Those Catholic employers that do not qualify for exemption are treated precisely the same as all other employers in the state, whether religious or nonreligious. Thus, while the WCEA may treat some Catholic employers more favorably than other employers, the WCEA does not under any circumstance treat Catholic employers less favorably than any other employers. About a law such as this, *Larson* has nothing to say.[10]

Catholic Charities argues the WCEA violates *Larson, supra*, 456 U.S. 228, for the additional reason that the law draws a distinction between religious organizations whose purpose is the "inculcation of religious values" (Health & Saf. Code, § 1367.25, subd. (b)(1)(A)) and other religious organizations that, in Catholic Charities' words, "have the temerity to engage in ministries *other than* the 'inculcation of religious values.' " (Italics in original.) We accept Catholic Charities' assertion that the Catholic Church's "self-understanding compels it to engage in 'corporal works of mercy,' which 'consist especially in feeding the hungry, sheltering the homeless, clothing the naked, visiting the sick and imprisoned, and burying the dead.' " (Quoting Catechism of the Catholic Church (1994) ¶ 2447, p. 588.) However, to the extent Catholic Charities is arguing the WCEA embodies a preference for non-Catholic denominations, the argument fails for the reasons already given.

Catholic Charities' intent may be to argue that the WCEA discriminates against charitable social work *as a religious practice.* Such an argument would implicate "[t]he principle that government, in pursuit of legitimate

---

[10] We read *Larson, supra*, 456 U.S. 228, as condemning laws that discriminate among *religions* or *religious denominations*. The law held unconstitutional in *Larson* reflected the Minnesota Legislature's "express design . . . to burden or favor selected religious *denominations*" (*id.*, at p. 255, italics added), specifically the Unification Church (*id.*, at pp. 232, 255, fn. 30). Here, in contrast, nothing about the Catholic religion prevents a Catholic religious organization from qualifying under the WCEA's exemption for religious organizations. We assume, for example, that a Catholic diocese or parish, acting as an employer, would typically qualify under the exemption.

In contrast, *Larson, supra*, 456 U.S. 228, does not purport to bar a state from attempting for valid regulatory purposes to distinguish among *organizations* based on sect-neutral grounds, even if those organizations claim a religious character. Indeed, *Larson* expressly permits the state to require an organization "claiming the benefits of [a] religious-organization exemption" from a regulatory statute "to *prove* that [it] is a religious organization within the meaning of the [statute]." (*Id.*, at p. 255, fn. 30, italics added.) Were this not true, the mere claim of religious character would effectively preclude state regulation.

interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief . . . ." (*Lukumi, supra,* 508 U.S 520, 543.) Applying this principle, the high court in *Lukumi* held unconstitutional an ordinance that permitted the killing of animals for food or sport, but not in religious rituals. The ordinance had " 'every appearance of a prohibition that society is prepared to impose upon [Santeria worshippers] but not upon itself.' " (*Id.,* at p. 545, quoting *The Florida Star v. B.J.F.* (1989) 491 U.S. 524, 542 [105 L.Ed.2d 443, 109 S.Ct. 2603].) The WCEA is not similar. If a religiously affiliated organization fails to qualify for exemption because its purpose is something other than the "inculcation of religious values" (Health & Saf. Code, § 1367.25, subd. (b)(1)(A)), then the result is simply that the organization becomes subject to the same obligations that apply to all other employers. Because the WCEA applies to all nonreligious employers engaged in charitable social work, no argument can logically be made that the WCEA imposes a burden on charitable social work only when performed for religious reasons.

As additional support for its claim that the WCEA's purpose is to discriminate against the Catholic Church, Catholic Charities contends the Legislature drafted the "religious employer" exception (Health & Saf. Code, § 1367.25, subd. (b)) with the specific intention of excluding Catholic hospitals and social service agencies like Catholic Charities. Catholic Charities draws an analogy to *Lukumi, supra,* 508 U.S. 520, 540–542, in which the high court considered specific statements by members of the Hialeah City Council as evidence that the ordinance prohibiting animal sacrifice was intended to suppress the Santeria religion. Catholic Charities' assertions about the legislative history of the WCEA do not justify a similar conclusion in this case.

According to Catholic Charities, the history of the WCEA suggests the Legislature intended the law to close a "Catholic gap" in insurance coverage for prescription contraceptives. The evidence does not support the contention. The phrase "Catholic gap" appears only in Catholic Charities' brief, not in the legislative history. Catholic Charities refers to the Senate testimony of a representative of Planned Parenthood, which opposed any exception for religious employers. Explaining that organization's position, the witness stated: "Primarily our intent was to close the gap in insurance coverage for contraception and prescription benefit plans. Our concern with granting an exemption is that that defeats the original purpose of the bill." The "gap" to which the witness apparently referred was the gap identified by a national consulting firm's 1999 study of health insurance for prescription contraceptives. This study, which received much attention in the Legislature, concluded that approximately 10 percent of commercially insured Californians did not already have insurance coverage for prescription contraceptives. The study identified this minority not as the employees of Catholic organizations, but as

persons covered by PPO and indemnity plans. While most HMO's covered prescription contraceptives, not all PPO and indemnity plans did. Catholic Charities' assertion that the purpose of the WCEA was to close a "Catholic gap" rather than a statewide statistical gap in coverage has no apparent evidentiary support.[11]

Next, Catholic Charities argues the Legislature deliberately narrowed the statutory exception for "religious employer[s]" (Health & Saf. Code, § 1367.25, subd. (b)) to include as few Catholic organizations as possible and specifically to exclude Catholic hospitals and social service organizations. The legislative history does show that the bill's sponsors argued against a broader exception. The bill's Senate sponsor, for example, stated in a committee hearing that "the intention of the authors as it relates to creating a religious exemption may not be the same intentions of the religions themselves in wanting to be exempted. [¶] The intention of the religious exemption in both these bills is an intention to provide for exemption for what is religious activity. The more secular the activity gets, the less religiously based it is, and the more we believe that they should be required to cover prescription drug benefits for contraception." Catholic Charities describes this and similar statements as evidence that the Legislature targeted specific Catholic organizations for disadvantageous treatment. But we have already examined and rejected that argument. The law treats some Catholic organizations more favorably than all other employers by exempting them; nonexempt Catholic organizations are treated the same as all other employers.

### 3. *Hybrid rights*

As an additional argument for applying strict scrutiny to its federal free exercise claim, Catholic Charities argues that the WCEA violates so-called hybrid rights. The term "hybrid rights" is loosely derived from *Smith, supra,* 494 U.S. 872, in which the high court repudiated the strict scrutiny test of *Sherbert,* 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790]. (See *Smith,* at pp. 882–884.) Along the way to that conclusion, the court distinguished certain of its prior decisions as having involved not just the free exercise clause but other constitutional provisions as well. Specifically, the court stated that "[t]he only decisions in which we have held that the First Amendment

---

[11] Catholic Charities also argues that the Legislature acted out of antipathy and spite towards the Catholic Church. Through this argument, Catholic Charities seeks to compare the Legislature's consideration of the WCEA with the Hialeah City Council's decision (see *Lukumi, supra,* 508 U.S. 520) to ban animal sacrifice as a way of suppressing the Santeria religion. In discussing the council's decision, the high court noted that Hialeah city officials had castigated Santeria as an "abomination to the Lord" and "the worship of demons," and that a public crowd attending the city council's meeting had interrupted with jeers and taunts the President of the Santeria Church. (*Id.,* at p. 541.) The legislative history of the WCEA discloses no comparable antipathy to the Catholic Church.

bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press[12] . . . , or the right of parents . . . to direct the education of their children[13] . . . ." (*Id.*, at p. 881.) The facts of *Smith*, the court observed, did "not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right." (*Smith*, at p. 882.)

Relying on this passage from *Smith, supra,* 494 U.S. 872, Catholic Charities argues the WCEA violates hybrid rights and, thus, requires us to apply strict scrutiny to its free exercise claim. The other rights violated, Catholic Charities asserts, are those protected by the free speech and establishment clauses of the First Amendment. (U.S. Const., 1st Amend.)

The high court has not, since the decision in *Smith, supra,* 494 U.S. 872, determined whether the hybrid rights theory is valid or invoked it to justify applying strict scrutiny to a free exercise claim. Justice Souter has mentioned hybrid rights in a concurring opinion, but only to criticize *Smith*'s reliance on the concept. (*Lukumi, supra,* 508 U.S. 520, 567 (opn. of Souter, J., conc. in part).) Some of the lower federal courts have treated the relevant passage from *Smith* as dictum and declined to apply, to assertedly hybrid claims, a standard stricter than the rational basis test. (*Leebaert v. Harrington* (2d Cir. 2003) 332 F.3d 134, 143–144; *Kissinger v. Board of Trustees* (6th Cir. 1993) 5 F.3d 177, 180.) Other lower federal courts appear to have assumed that hybrid claims trigger a higher level of scrutiny, but have concluded that "a plaintiff does not allege a hybrid-rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." (*Miller v. Reed* (9th Cir. 1999) 176 F.3d 1202, 1208; see also *Civil Lib. for Urban Believers v. City of Chicago* (7th Cir. 2003) 342 F.3d 752, 765; *Swanson by and through Swanson v. Guthrie ISD I-L* (10th Cir. 1998) 135 F.3d 694, 700.)

Catholic Charities argues that the non-free-exercise component of a hybrid claim need only be "colorable" and not ultimately meritorious. While some courts have proposed such a rule (e.g., *Miller v. Reed, supra,* 176 F.3d 1202, 1207; *Swanson by and through Swanson v. Guthrie ISD I-L, supra,* 135 F.3d 694, 700), no court has relied on it to grant relief. Nor would such a rule make sense. As Justice Souter has explained, "[i]f a hybrid claim is simply

---

[12] Namely, *Follett v. McCormick* (1944) 321 U.S. 573 [88 L.Ed. 938, 64 S.Ct. 717], *Murdock v. Pennsylvania* (1943) 319 U.S. 105 [87 L.Ed. 1292, 63 S.Ct. 870], and *Cantwell v. Connecticut, supra,* 310 U.S. 296; see *Smith, supra,* 494 U.S. 872, 881.

[13] Namely, *Wisconsin v. Yoder, supra,* 406 U.S. 205, and *Pierce v. Society of Sisters* (1925) 268 U.S. 510 [69 L.Ed. 1070, 45 S.Ct. 571]; see *Smith, supra,* 494 U.S. 872, 881.

one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule . . . ." (*Lukumi, supra,* 508 U.S. 520, 567 (opn. of Souter, J., conc. in part).) For this reason, the Sixth Circuit has rejected as "completely illogical" the proposition that "the legal standard [of review] under the Free Exercise Clause depends on whether a free-exercise claim is coupled with other constitutional rights." (*Kissinger v. Board of Trustees, supra,* 5 F.3d 177, 180 & fn. 1.)

We are aware of no decision in which a federal court has actually relied solely on the hybrid rights theory to justify applying strict scrutiny to a free exercise claim. Indeed, the only federal decision that can properly be said to have relied on the theory at all is *E.E.O.C. v. Catholic University of America, supra,* 83 F.3d 455, 467, in which the court mentioned hybrid rights as an alternative basis for its conclusion that federal employment law could not be applied to require a Catholic educational institution to grant tenure to a professor of canon law. The principal basis for the court's holding was the ministerial exception. (*Id.,* at pp. 463–465; see *ante,* at p. 543 et seq.)[14]

Assuming for the sake of argument the hybrid rights theory is not merely a misreading of *Smith, supra,* 494 U.S. 872, Catholic Charities has not alleged a meritorious constitutional claim that might justify the theory's application to this case. Catholic Charities argues that to assist in providing employees with insurance for prescription contraceptives would be viewed as an endorsement of their use and that the WCEA, by compelling such assistance, violates the free speech clause by requiring the organization to engage in symbolic speech it finds objectionable. The argument lacks merit. Certainly "the First Amendment may prevent the government from compelling individuals to express certain views . . . ." (*United States v. United Foods, Inc.* (2001) 533 U.S. 405, 410 [150 L.Ed.2d 438, 121 S.Ct. 2334], citing *Wooley v. Maynard* (1977) 430 U.S. 705, 713–717 [51 L.Ed.2d 752, 97 S.Ct. 1428] [state may not compel unwilling motorists to display state motto, "Live Free or Die," on vehicle license plates], and *Board of Education v. Barnette* (1943) 319 U.S. 624, 630–642 [87 L.Ed. 1628, 63 S.Ct. 1178] [state may not compel public school pupils to salute the flag or recite the Pledge of Allegiance].) However, Catholic Charities' compliance with a law regulating health care benefits is not speech. The law leaves Catholic Charities free to express its disapproval of prescription contraceptives and to encourage its employees not to use them. For purposes of the free speech clause, simple obedience to a law that does not require one to convey a verbal or symbolic message cannot reasonably be seen as a statement of support for the law or its purpose. Such a rule would, in effect, permit each individual to choose which

---

[14] A few state courts have mentioned the hybrid rights theory. (*First Covenant Church v. Seattle* (1992) 120 Wn.2d 203 [840 P.2d 174, 181–182] [alternative ground for decision]; *City Chapel v. South Bend* (Ind. 2001) 744 N.E.2d 443, 452–454 (plur. opn. of Dickson, J.).)

laws he would obey merely by declaring his agreement or opposition. (Cf. *Buhl v. Hannigan* (1993) 16 Cal.App.4th 1612, 1626 [20 Cal.Rptr.2d 740] & fn. 11 [dismissing as "ludicrous" a motorcyclist's claim that compliance with a law requiring the wearing of helmets in effect compelled speech supporting the law, regardless of the motivation for noncompliance].)[15]

### 4. *California Constitution*

Catholic Charities' final argument for applying strict scrutiny invokes the free exercise clause of the California Constitution. (Cal. Const., art. I, § 4.)[16] That clause, Catholic Charities contends, forbids the state to burden the practice of religion, even incidentally, through a neutral, generally applicable law, unless the law in question serves a compelling governmental interest and is narrowly tailored to achieve that interest. Catholic Charities asserts, in other words, that we must interpret the California Constitution the same way the United States Supreme Court interpreted the federal Constitution's free exercise clause in *Sherbert, supra,* 374 U.S. 398.

What might be the proper standard of review for challenges to neutral, generally applicable laws under the state Constitution's free exercise clause is a question we left open in *Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1177–1179 [51 Cal.Rptr.2d 700, 913 P.2d 909] (*Smith v. FEHC*). There we rejected, under both federal and state law, a landlord's religiously based claim to exemption from a fair housing statute prohibiting discrimination on the basis of marital status. (Gov. Code, § 12955, subd. (a).) Although the case arose after the high court's decision in *Smith, supra,* 494 U.S. 872, we nevertheless applied strict scrutiny to the landlord's federal claim because the Religious Freedom Restoration Act required us to do so. (42 U.S.C. § 2000bb et seq., hereafter RFRA; see *Smith v. FEHC*, at pp. 1165–1167.)[17] We did not decide whether the landlord's claim under the state Constitution's free exercise clause required strict scrutiny. A plurality of three justices assumed for the sake of argument that it did, but declined to "address the scope and proper interpretation of California Constitution, article I, section 4." (*Smith v. FEHC*, at p. 1179 (plur. opn. of Werdegar, J., with George and Arabian, JJ., conc.).) "These important questions," the plurality wrote, "should await a case in which their resolution affects the outcome."

---

[15] Catholic Charities perfunctorily asserts that its claims under the establishment clause (U.S. Const., 1st Amend.) also justify treating this case as involving hybrid rights. We have, however, already determined that those claims lack merit.

[16] "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. . . ." (Cal Const., art. I, § 4.)

[17] The United States Supreme Court subsequently held RFRA unconstitutional. (*City of Boerne v. Flores* (1997) 521 U.S. 507 [138 L.Ed.2d 624, 117 S.Ct. 2157].)

(*Ibid.*) Justice Mosk's concurring opinion provided a fourth vote for the disposition. (*Id.*, at pp. 1179–1192 (conc. opn. of Mosk, J.).)

No decision about the appropriate standard of review can be gleaned from the various separate opinions in *Smith v. FEHC, supra,* 12 Cal.4th 1143. The subject of Justice Mosk's concurring opinion was his view that RFRA was unconstitutional; he did not address the state Constitution. (*Smith v. FEHC*, at pp. 1179–1192 (conc. opn. of Mosk, J.).) Justice Kennard, who also wrote separately, would have held that the challenged law violated RFRA; she, too, did not address the state Constitution. (*Id.*, at pp. 1192–1218 (conc. & dis. opn. of Kennard, J.).) Justice Baxter, who otherwise agreed with Justice Kennard, wrote separately to emphasize the point we now make, namely, that the court's various opinions left unsettled "the scope of protection of religious liberty under the free exercise clause of our state Constitution." (*Id.*, at p. 1250 (conc. & dis. opn. of Baxter, J., with Lucas, C. J., conc.).)

The only published decision purporting to determine the standard of review for claims under the California Constitution's free exercise clause is *Brunson v. Department of Motor Vehicles* (1999) 72 Cal.App.4th 1251 [85 Cal.Rptr.2d 710]. The Court of Appeal in *Brunson* rejected the contention that the plaintiffs' religious beliefs excused them from complying with a statutory duty (Veh. Code, §§ 1653.5, 12800, subd. (a)) to provide their Social Security numbers to the Department of Motor Vehicles when applying for drivers' licenses. The court interpreted *Smith v. FEHC, supra,* 12 Cal.4th 1143, as mandating application of the rational basis test to the petitioners' claims under the state free exercise clause. (*Brunson v. Department of Motor Vehicles, supra,* at pp. 1255–1256.) The court's reading of *Smith v. FEHC* was erroneous. As we have just explained, in *Smith v. FEHC* we left the question open.[18] The Court of Appeal in the case before us, while acknowledging *Brunson,* examined the question independently and concluded that challenges under the state free exercise clause to neutral, generally applicable laws should be evaluated under the rational basis standard of *Smith, supra,* 494 U.S. 872.

Certainly the high court's decision in *Smith, supra,* 494 U.S. 872, does not control our interpretation of the state Constitution's free exercise clause. Neither does the decision in *Sherbert, supra,* 374 U.S. 398. We have observed many times "that the meaning of California Constitution article I, section 4

---

[18] While the court in *Brunson v. Department of Motor Vehicles, supra,* 72 Cal.App.4th 1251, thus misinterpreted *Smith v. FEHC, supra,* 12 Cal.4th 1143, we have no occasion to reexamine the *Brunson* court's ultimate conclusion about the validity of the statutes at issue in that case. We note the Legislature recently amended Vehicle Code sections 1653.5 and 12800, subdivision (a), to permit the Department of Motor Vehicles to accept appropriate numbers and identifiers other than Social Security numbers. (Stats. 2003, ch. 326, §§ 1, 2.)

. . . is not dependent on the meaning of any provision of the federal Constitution. The state charter declares in so many words that '[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution.' (Cal. Const., art. I, § 24.) 'Respect for our Constitution as "a document of independent force" [citation] forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter.' " (*Smith v. FEHC, supra,* 12 Cal.4th 1143, 1177, quoting *People v. Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108], and *People v. Brisendine* (1975) 13 Cal.3d 528, 549–550 [119 Cal.Rptr. 315, 531 P.2d 1099].) Thus, if a settled interpretation of the California Constitution's free exercise clause had existed before 1990, when the United States Supreme Court abandoned the *Sherbert* test, we would simply adhere to that interpretation, regardless of *Smith, supra,* 494 U.S. 872.

However, no settled interpretation of the state Constitution's free exercise clause existed in 1990. Between the dates of *Sherbert, supra,* 374 U.S. 398, and *Smith, supra,* 494 U.S. 872, our own decisions assessing the constitutionality of neutral, generally applicable laws that incidentally burdened religious practices applied the federal and state free exercise clauses interchangeably, without ascribing any independent meaning to the state clause. (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 138–141 [253 Cal.Rptr. 1, 763 P.2d 852]; *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1112–1120 [252 Cal.Rptr. 122]; *In re Arias* (1986) 42 Cal.3d 667, 692 [230 Cal.Rptr. 505, 725 P.2d 664] & fn. 28, 42 Cal.3d 667 [230 Cal.Rptr. 505, 725 P.2d 664]; *People v. Woody* (1964) 61 Cal.2d 716, 718, fn. 1 [40 Cal.Rptr. 69, 394 P.2d 813].) In decisions prior to *Sherbert,* we generally took an approach similar to the high court's decisions of the same era, declining to exempt religiously motivated conduct from neutral, generally applicable laws. We wrote, for example, that "a person is free to hold whatever belief his conscience dictates, but when he translates his belief into action he may be required to conform to reasonable regulations which are applicable to all persons and are designed to accomplish a permissible objective." (*Rescue Army v. Municipal Court* (1946) 28 Cal.2d 460, 470 [171 P.2d 8].) We also wrote that, "[i]f the applicability of government regulation turned on the religious motivation of activities, plausible motivations would multiply and in the end vitiate any regulation." (*Gospel Army v. City of Los Angeles* (1945) 27 Cal.2d 232, 243 [163 P.2d 704]; see also *Gabrielli v. Knickerbocker* (1938) 12 Cal.2d 85, 90–92 [82 P.2d 391] [declining to reinstate a pupil expelled from public school for refusing on religious grounds to salute the flag]; *Ex parte Andrews* (1861) 18 Cal. 678, 683–685 [upholding a Sunday closing law].)

In view of this history, we may safely agree with the scholars who concluded in 1993, years after the high court decided *Smith, supra,* 494 U.S.

872, that "[s]ection 4 has not so far played an independent role in free exercise claims." (Grodin et al., The Cal. State Constitution: A Reference Guide (1993) p. 44.)

In a case that truly required us to do so, we should not hesitate to exercise our responsibility and final authority to declare the scope and proper interpretation of the California Constitution's free exercise clause. (Cal. Const., art. I, § 4.) Here, however, we need not do so because Catholic Charities' challenge to the WCEA fails in any event. As we explain below, the statute passes strict scrutiny. A future case might lead us to choose the rule of *Sherbert, supra,* 374 U.S. 398 [83 S.Ct. 1790], the rule of *Smith, supra,* 494 U.S. 872, or an as-yet unidentified rule that more precisely reflects the language and history of the California Constitution and our own understanding of its import. But "[t]hese important questions should await a case in which their resolution affects the outcome." (*Smith v. FEHC, supra,* 12 Cal.4th 1143, 1179.)

■ We therefore review Catholic Charities' challenge to the WCEA under the free exercise clause of the California Constitution in the same way we might have reviewed a similar challenge under the federal Constitution after *Sherbert, supra,* 374 U.S. 398, and before *Smith, supra,* 494 U.S. 872. In other words, we apply strict scrutiny. Under that standard, a law could not be applied in a manner that substantially burdened a religious belief or practice unless the state showed that the law represented the least restrictive means of achieving a compelling interest or, in other words, was narrowly tailored. (See *Thomas v. Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 718 [67 L.Ed.2d 624, 101 S.Ct. 1425]; *Sherbert, supra,* 374 U.S. 398, 403, 406, 407–408.) For these purposes, a law substantially burdens a religious belief if it "conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . ." (*Thomas v. Rev. Bd., Ind. Empl. Sec. Div., supra,* 450 U.S. 707, 717–718.)

■ Applying this standard, we consider first whether the WCEA in fact burdens Catholic Charities' religious beliefs. We do not doubt Catholic Charities' assertion that to offer insurance coverage for prescription contraceptives to its employees would be religiously unacceptable. Catholic Charities adequately supports the assertion with the declaration of a Roman Catholic priest who serves as Executive Director of the Secretariat for Doctrine and Pastoral Practices of the National Conference of Roman Catholic Bishops. Catholic Charities may, however, avoid this conflict with its religious beliefs simply by not offering coverage for prescription drugs. The WCEA applies only to employers who choose to offer insurance coverage for prescription drugs; it does not require any employer to offer such coverage.

Anticipating this objection, Catholic Charities argues that its religious beliefs also require it to offer its employees insurance for prescription drugs. On this point, however, the declaration just mentioned seems open to interpretation. The declarant states: "The clear teaching and firm doctrine of the Roman Catholic Church is that all employers, religious or otherwise, are to provide just wages and benefits to employees, regardless of their religious affiliations and beliefs, as an obligation arising from the Gospel message of justice and charity. The goal of the Roman Catholic Church, also as a matter of justice and charity, is that all workers regardless of their circumstances should receive adequate health-care coverage." In the present context—that of weighing an asserted burden on religious beliefs against the state interests supporting a challenged statute—the declaration raises the question whether Catholic Charities' beliefs about the requirements of "justice and charity" are necessarily equivalent to *religious* beliefs. We must ask this question because a claim under the free exercise clause must be "rooted in religious belief" and not on "philosophical" choices or "[a] way of life, however virtuous and admirable." (*Wisconsin v. Yoder, supra*, 406 U.S. 205, 215, 216.) "Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." (*Id.*, pp. 215–216, fn. omitted.)[19]

██ The need to ask questions such as these places a court in an uncomfortable position. "Repeatedly and in many different contexts," the high court has "warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." (*Smith, supra*, 494 U.S. 872, 887.) The line between construing Catholic Charities' declaration, which we must do, and determining the plausibility of religious claims, which we may not do, is fine indeed. Equally fine is the line between construing the declaration and determining whether the asserted burden falls on a protected religious belief or an unprotected philosophical choice, which we also must do. (*Wisconsin v. Yoder, supra*, 406 U.S. 205, 215–216.) If we had to ask and answer these difficult questions, we would. But we need not do so because

---

[19] Assuming the obligation to provide adequate health care coverage is a religious belief, one might also ask whether a religious employer opposed to contraceptives on religious grounds could avoid all conflict with its beliefs by declining coverage for prescription drugs (thus satisfying the WCEA) while offering its employees a raise to offset the reduced benefits, accompanied by whatever condemnations of contraceptives the employer wished to offer. A raise might be far more expensive for the employer than insurance, and a law that indirectly made a religious practice more expensive might at some point become a constitutionally significant burden on religious exercise. However, "it cannot be expected, much less required that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions." (*Braunfeld v. Brown, supra*, 366 U.S. 599, 605.)

Catholic Charities' claim fails in any event: Assuming for the sake of argument the WCEA substantially burdens a religious belief or practice, the law nevertheless serves a compelling state interest and is narrowly tailored to achieve that interest.

■■■ The WCEA serves the compelling state interest of eliminating gender discrimination. Evidence before the Legislature showed that women during their reproductive years spent as much as 68 percent more than men in out-of-pocket health care costs, due in part to the cost of prescription contraceptives and the various costs of unintended pregnancies, including health risks, premature deliveries and increased neonatal care. (See p. 537, *ante.*) Assembly, Senate, and legislative staff analyses of the bills that became the WCEA consistently identify the elimination of this economic inequity as the bills' principal object. Catholic Charities, which pays men and women equal wages, argues the type of inequity that prompted the WCEA cannot properly be viewed as gender discrimination. To identify subtle forms of gender discrimination, however, is within the Legislature's competence. Nor is the identification irrational.[20] Congress, making a similar identification, amended title VII to define discrimination "on the basis of sex" as including discrimination in benefits "on the basis of pregnancy, childbirth, or related medical conditions . . . ." (42 U.S.C. § 2000e(k)) (Pregnancy Discrimination Act), abrogating *General Electric Co. v. Gilbert* (1976) 429 U.S. 125 [50 L.Ed.2d 343, 97 S.Ct. 401]; see *Newport News Shipbuilding & Dry Dock v. EEOC* (1983) 462 U.S. 669, 678 [77 L.Ed.2d 89, 103 S.Ct. 2622] [acknowledging abrogation].) The only reported federal decision addressing the issue holds that the statute just quoted requires employers to include coverage for prescription contraceptives when offering health care plans that cover prescription drugs. (*Erickson v. Bartell Drug Co.* (W.D.Wash. 2001) 141 F.Supp.2d 1266, 1270–1272; but cf. *Glaubach v. Regence Blueshield* (2003) 149 Wn.2d 827 [74 P.3d 115, 116–119] [holding that a Washington statute requiring insurers to provide coverage regardless of sex does not mandate coverage of prescription contraceptives].) Certainly the interest in eradicating gender discrimination is compelling. We long ago concluded that discrimination based on gender violates the equal protection clause of the California Constitution (art. I, § 7, subd. (a)) and triggers the highest level of scrutiny. (*Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17–20 [95 Cal.Rptr. 329, 485 P.2d 529].)

Strongly enhancing the state's interest is the circumstance that any exemption from the WCEA sacrifices the affected women's interest in receiving

---

[20] At least 19 other states have adopted laws requiring that employers or insurers provide coverage for prescription contraceptives. (See Note, *The Quest for Equality: Comprehensive Insurance Coverage of Prescription Contraceptives* (2002) 82 Boston U. L.Rev. 1289, 1290, 1298–1301; Comment, *Contraceptive Coverage Laws: Eliminating Gender Discrimination or Infringing on Religious Liberties?* (2002) 69 U. Chicago L.Rev. 1867, 1877, fn. 68.)

equitable treatment with respect to health benefits. We are unaware of any decision in which this court, or the United States Supreme Court, has exempted a religious objector from the operation of a neutral, generally applicable law despite the recognition that the requested exemption would detrimentally affect the rights of third parties. The high court in *Wisconsin v. Yoder, supra*, 406 U.S. 205, painstakingly limited its holding to avoid endorsing any such result. While concluding that the Amish parents in that case were entitled under the strict scrutiny standard of *Sherbert, supra*, 374 U.S. 398, to an exemption from a general law requiring their older children to attend public school, the court emphasized that its conclusion depended on the assumption that no Amish child wished to attend. (*Wisconsin v. Yoder, supra*, at pp. 230–232.) Similarly, in rejecting a religious employer's challenge to a law requiring him to pay Social Security and unemployment taxes for his employees, the court wrote that "[g]ranting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees." (*United States v. Lee, supra*, 455 U.S. 252, 261.) "Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." (*Ibid.*; cf. *Tony and Susan Alamo Foundation v. Sec'y of Labor, supra*, 471 U.S. 290, 303–306 [religious organization must comply with federal minimum wage laws]; *Dole v. Shenandoah Baptist Church* (4th Cir. 1990) 899 F.2d 1389, 1393–1400 [religious school must comply with federal law requiring equal pay for men and women].) We see no reason why a different rule should apply when a nonprofit corporation enters the general labor market.

Nor are any less restrictive (or more narrowly tailored) means readily available for achieving the state's interest in eliminating gender discrimination. Any broader exemption increases the number of women affected by discrimination in the provision of health care benefits. Catholic Charities argues the Legislature could more widely exempt employers from the WCEA without increasing the number of affected women by mandating public funding of prescription contraceptives for the employees of exempted employers. The Legislature included such a provision in an earlier version of the WCEA (Assem. Bill No. 1112 (1997–1998 Reg. Sess.)), which the Governor vetoed. But Catholic Charities points to no authority requiring the state to subsidize private religious practices. (Cf. *Lyng v. Northwest Indian Cemetery Prot. Assn., supra*, 485 U.S. 439, 447–453 [government need not forgo road building or timber harvesting on its own property to avoid interference with Native American religious practices].)

Catholic Charities next argues the WCEA is underinclusive, and therefore not narrowly tailored, because it does not facilitate access to prescription contraceptives for "indigent women, unemployed women, stay-at-home mothers, women whose employers do not offer health insurance benefits, and women in part-time employment [who] do not qualify for health benefits." But this argument misconceives the principal purpose of the WCEA, which is not to facilitate access to contraceptives but to eliminate a form of gender discrimination in the provision of health benefits. The situations Catholic Charities identifies, in which no employer or insurer is providing health benefits, do not entail such discrimination.

Finally on this point, Catholic Charities argues the WCEA is not narrowly tailored because it is *overinclusive*. Catholic Charities justifies this surprising assertion by arguing that the law must be overinclusive if it applies to employers that do not discriminate on the basis of gender, and that Catholic Charities does not discriminate on that basis because it does not provide contraceptive coverage to women or to men (e.g., vasectomies). With this argument, however, Catholic Charities merely restates its disagreement with the Legislature's determination that the exclusion of prescription contraceptives from health care plans constitutes a form of gender discrimination. As we have already explained, the Legislature was entitled to reach that conclusion.

For these reasons, applying the strict scrutiny test of *Sherbert, supra*, 374 U.S. 398, to Catholic Charities' claim against the WCEA under the free exercise clause of the state Constitution, we find the WCEA meets that test. We do not hold that the state free exercise clause requires courts to apply the *Sherbert* test to neutral, generally applicable laws that incidentally burden religious practice. Instead, as explained above, we leave that question for another day.

### C. *Rational Basis*

Catholic Charities' final challenge to the WCEA is that it violates the rational basis test. More specifically, Catholic Charities argues the state has defined the exempt category of "religious employer" (Health & Saf. Code, § 1367.25, subd. (b)) with arbitrary criteria. "In effect," according to Catholic Charities, "the Legislature decided that any religious institution that employs individuals of other faiths or that ministers to persons of all faiths (or no faith)—in effect any 'missionary' church or church with social outreach—is not sufficiently 'religious' to qualify for exemption," and that these classifications are "wholly unrelated to any legitimate state interest."

The argument lacks merit. The WCEA's exemption for religious organizations, even if not applicable to Catholic Charities, rationally serves the legitimate interest of complying with the rule barring interference with the relationship between a church and its ministers. (See *ante*, at p. 543 et seq.) Although the high court has not spoken on the subject, the lower federal courts have held that the constitutionally based ministerial exemption survives the decision in *Smith, supra,* 494 U.S. 872. (See, e.g., *Gellington v. Christian Methodist Episcopal Church, supra,* 203 F.3d 1299, 1302–1304; *Combs v. Cen Tx Ann Conf United Methodist Church, supra,* 173 F.3d 343, 347–350; *E.E.O.C. v. Catholic University of America, supra,* 83 F.3d 455, 460–463; cf. *Schmoll v. Chapman University, supra,* 70 Cal.App.4th 1434, 1438–1445 [recognizing a ministerial exception to state employment laws].) Most organizations entitled to invoke the ministerial exemption will be involved in the "inculcation of religious values," which the first criterion requires. (Health & Saf. Code, § 1367.25, subd. (b)(1)(A).) Many will also satisfy the WCEA's fourth exemption criterion, which requires that a religious employer qualify for federal tax exemption as a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order. (See 26 U.S.C. § 6033(a)(2)(A)(i) and (iii), cited in Health & Saf. Code, § 1367.25, subd. (b)(1)(D).) If in any case the constitutionally required ministerial exception were broader than the statutory exemption, the former would of course take precedence.

The second criterion, to which Catholic Charities specifically objects as lacking a rational basis, requires that an employer "primarily employ[] persons who share the religious tenets of the entity." (Health & Saf. Code, § 1367.25, subd. (b)(1)(B).) This provision, in effect, accommodates religious employers more broadly than the ministerial exemption requires by extending the WCEA's exemption to employees who could not fall within the ministerial exemption. The provision has the legitimate, rational purpose of accommodating a state-imposed burden on religious exercise. (*Amos, supra,* 483 U.S. 327, 334–335.)

The third criterion, to which Catholic Charities also objects, is problematic. To qualify under it, an employer must "serve[] primarily persons who share the religious tenets of the entity." (Health & Saf. Code, § 1367.25, subd. (b)(1)(C).) To imagine a legitimate purpose for such a requirement is difficult. Reading the provision literally, a hypothetical soup kitchen run entirely by the ministers of a church, which inculcates religious values to those who come to eat (thus satisfying the first, second, and fourth criteria), would lose its claim to an exemption from the WCEA if it chose to serve the hungry without discrimination instead of serving co-religionists only. The Legislature may wish to address this problem. Catholic Charities, however, cannot successfully challenge the WCEA on this ground because the organization concedes it does not qualify under any of the criteria for exemption,

including the relatively objective terms of the federal tax statute cited in the fourth criterion. (Health & Saf. Code, § 1367.25, subd. (b)(1)(D).) Catholic Charities thus cannot qualify for exemption in any event.

### III. Disposition

The decision of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—In September 1999, the Legislature enacted the Women's Contraception Equity Act (WCEA). Under this law, every group health care policy that "provides coverage for outpatient prescription drug benefits" must, as of January 1, 2000, include coverage for contraceptives. (Health & Saf. Code, § 1367.25.)[1] Exempt from the WCEA are policies sold to entities that are religious employers. To fall within the act's definition of "religious employer," each of these four requirements must be satisfied:

"(A) The inculcation of religious values is the purpose of the entity.

"(B) The entity primarily employs persons who share the religious tenets of the entity.

"(C) The entity serves primarily persons who share the religious tenets of the entity.

"(D) The entity is a nonprofit organization as described in Section 6033(a)(2)(A)i or iii, of the Internal Revenue Code of 1986, as amended." (§ 1367.25, subd. (b)(1).)

Plaintiff Catholic Charities of Sacramento, Inc. (Catholic Charities), which has brought this lawsuit challenging the constitutionality of the religious employer exemption, acknowledges that it does not satisfy any of the four requirements for that exemption. Catholic Charities' complaint alleges that it is a nonprofit public benefit corporation "operated in connection with the Roman Catholic Bishop of Sacramento" as "an organ of the Roman Catholic Church." The complaint further alleges that Catholic Charities' mission is to perform good works, such as "providing immigrant resettlement programs, elder care, counseling, food, clothing and affordable housing for the poor and needy, housing and vocational training of the developmentally disabled and

---

[1] Further undesignated statutory references are to the Health and Safety Code.

the like." According to the complaint, Catholic Charities provided prescription drug coverage to its 183 employees before the WCEA's effective date; for it to continue to do so now would be promoting the use of contraceptives, a sinful practice under Catholic Church doctrine. For the purposes of deciding the legal issues in this case, the majority accepts these allegations as true, as do I.

I agree with the majority that Catholic Charities is properly subject to the WCEA. In the course of its discussion, however, the majority rejects Catholic Charities' argument that the religious employer exemption discriminates against "religious organizations . . . that engage in charitable work, as opposed to work that is purely spiritual or evangelical." (Maj. opn., *ante*, at p. 552.) I am not persuaded that the first requirement of the religious employer exemption, limiting the exemption to entities whose primary purpose is the "inculcation of religious values" (§ 1367.25, subd. (b)(1)(A)), can be reconciled with the establishment clauses of the federal and state Constitutions. This is a close and difficult issue. I need not resolve it, however, because Catholic Charities does not meet the exemption's fourth requirement that it is a religious entity exempt from federal tax filing, a requirement that both the majority and I agree is constitutional.

## I

The United States Constitution's First Amendment provides that "Congress shall make no law respecting an establishment of religion." (U.S. Const., 1st Amend.) This provision applies to the states through the Fourteenth Amendment; thus, state governments too are prohibited from making such laws. Like its federal counterpart, California's Constitution provides that the Legislature "shall make no law respecting an establishment of religion." (Cal. Const., art. I, § 4.) Laws that prefer one religion or religious organization over another (often called "denominational preferences") violate these provisions. (See *Epperson v. Arkansas* (1968) 393 U.S. 97, 106 [21 L.Ed.2d 228, 89 S.Ct. 266] ["State may not adopt programs or practices . . . which 'aid or oppose' any religion"]; *Everson v. Board of Education* (1947) 330 U.S. 1, 15 [91 L.Ed. 711, 67 S.Ct. 504] [no state can "pass laws which aid one religion" or that "prefer one religion over another"].)

On this basis, the United States Supreme Court in *Larson v. Valente* (1982) 456 U.S. 228 [72 L.Ed.2d 33, 102 S.Ct. 1673] invalidated a Minnesota law that treated religious organizations differently. The law in question generally required charitable organizations that solicited contributions to register with the state and to disclose their income and its sources, as well as costs of management, fundraising, and public education. Exempt from this law were religious organizations that received more than 50 percent of their charitable

contributions from their own members or affiliates, rather than from the general public. Not exempt were religious organizations such as the Holy Spirit Associations for the Unification of World Christianity (Unification Church) that received more than half of their charitable contributions from " 'door-to-door and public-place proselytizing and solicitation of funds,' " a practice emphasized by the tenets of that religion. (*Id.* at p. 234.) Unification Church members sued, seeking exemption from the law. The federal district court granted the plaintiffs a preliminary injunction, which was affirmed on appeal. The United States Supreme Court, in turn, agreed that the law impermissibly "impose[d] the registration and reporting requirements . . . on some religious organizations but not on others"; it thus did "not operate evenhandedly," but instead "effect[ed] the *selective* legislative imposition of burdens and advantages upon particular denominations." (*Id.* at pp. 253–254.)

Catholic Charities argues here that the WCEA's religious employer exemption similarly imposes its burdens and advantages on some religious organizations but not others. Catholic Charities points out that the exemption favors those religious organizations whose purpose is "[t]he inculcation of religious values" (§ 1367.25, subd. (b)(1)(A)), while disfavoring those entities, such as Catholic Charities, whose purpose is to perform good works. Comparing the WCEA to the Minnesota law struck down by the high court in *Larson v. Valente, supra,* 456 U.S. 228, 253, which "impose[d] the registrative and reporting requirements on some religious organizations but not on others," Catholic Charities argues that similarly here the WCEA imposes the contraceptive insurance coverage requirement on some religious organizations but not on others.

To distinguish the WCEA's religious employer exemption from the religious organization charitable reporting exemption invalidated in *Larson v. Valente, supra,* 456 U.S. 228, the majority states: "The WCEA confers the special benefit of exemption only on those religious organizations whose tenets are opposed to prescription contraceptives and that meet the other requirements for exemption. . . . Those Catholic employers that do not qualify for exemption *are treated precisely the same as* all other employers in the state, whether religious or nonreligious." (Maj. opn., *ante,* at p. 554, italics added.) But the Minnesota charitable solicitation registration law struck down in *Larson v. Valente* treated religious organizations not qualifying for its exemption "precisely the same as" nonreligious charitable solicitors and other nonqualifying religious solicitors. Thus, in treating religious entities that do not qualify for its exemption just like nonreligious entities subject to its requirements, the WCEA seems substantially similar to that unconstitutional Minnesota law.

Under the high court's analysis in *Larson v. Valente, supra,* 456 U.S. 228, a law that selectively discriminates among religious organizations might still

not violate the establishment clause if it is "closely fitted to the furtherance" of a "compelling governmental interest." (*Id.* at p. 255.) As the majority explains, and I agree, the WCEA serves the compelling state interest of eliminating gender discrimination. (Maj. opn., *ante*, at p. 255.) But in upholding the first requirement of the religious employer exemption (limiting it to those religious entities whose purpose is inculcating religious values), the majority does not explain how that limitation is "closely fitted" to the elimination of gender discrimination. I have serious doubts that the First Amendment, as construed by the United States Supreme Court, allows California to limit its religious employer exemption to religious entities that have as their purpose the inculcation of religious values, denying that exemption to religious entities, like Catholic Charities, that are organized for the purpose of feeding the hungry, caring for the sick, and providing shelter to the homeless.[2]

## II

As I noted at the outset, dispositive here is Catholic Charities' concession that it does not meet the fourth requirement for the WCEA's religious employer exemption as a religious entity exempt from federal tax filing. (See § 1367.25, subd. (b)(1)(D).) Because the concerns expressed above about the constitutionality of the exemption's first requirement—that "inculcation of religious values" (§ 1367.25, subd. (b)(1)(A)) is the purpose of the entity— can have no effect on the judgment, I agree with the majority that if Catholic Charities is to afford its employees health coverage that would include outpatient prescription drugs, it must do so through a policy that provides coverage for prescription contraceptives.

**BROWN, J.,** Dissenting.—This case presents questions on which reasonable minds can differ—especially in light of the whimsical and somewhat erratic path of free exercise jurisprudence after the Supreme Court's decision in *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] (*Smith*). However, as a court pledged to defend constitutional limits, operating in the post-*Smith* environment, we ought to think very carefully about our role in defining the road ahead.

---

[2] The majority construes *Larson v. Valente, supra,* 456 U.S. 228, as prohibiting only those laws that discriminate among religious denominations and thus as having no effect on Catholic Charities, an entity affiliated with the Roman Catholic denomination. (Maj. opn., *ante,* at p. 554, fn. 10.) Even under this view, the first requirement of the WCEA's religious employer exemption is of questionable constitutionality because it disfavors those denominations that have as their primary purpose something other than the inculcation of religious values. Thus any organization or entity established by a religious denomination whose primary purpose was attending to the needy would on that basis be denied the religious employer exemption.

Instead of being dismissive of the very serious claims presented here, we should treat them with the highest respect.

After *Smith*, neutral, generally applicable laws do not have to survive compelling state interest review. Such laws require no justification no matter how severely they burden the individual religious claimant and no matter how inconsequential the government interest. (See *Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1195 [51 Cal.Rptr.2d 700, 913 P.2d 909] (conc. & dis. opn. of Kennard, J.) (*Smith v. FEHC*).) It is, however, far from self-evident if, or how, *Smith* applies to laws that directly contravene the religious conduct of religious organizations. The Women's Contraceptive Equity Act (WCEA) attempts to circumvent this potentially substantial hurdle by creating a very narrow exemption for churches. But that begs an even more fundamental question: may the government determine what parts of bona fide religious organizations are religious and what parts are secular? And, in particular, may the government make such distinctions in order to infringe the religious freedom of that portion of the organization the government characterizes as secular? Because, unlike the majority, I do not think *Smith* provides obvious answers to these questions, I respectfully dissent.

## I.

The proponents of the WCEA make an argument with which no one can disagree. Women in the workplace are entitled to be treated fairly and equitably and to be free from discrimination on the basis of gender. Government has not only the authority, but the obligation, to discourage invidious discrimination in the workplace, and this includes discrimination in the distribution of benefits. (See, e.g., *Erickson v. Bartell Drug Company* (W.D.Wash. 2001) 141 F.Supp.2d 1266, 1271 [title VII of the Civil Rights Act of 1964 (title VII) as amended by the Pregnancy Discrimination Act, prevented exclusion of contraception from prescription drug coverage offered by employer]; 42 U.S.C. § 2000e(k) [prohibiting, under title VII, discrimination on the basis of "pregnancy, childbirth, or related medical conditions"]; U.S. EEOC, Com. Dec. (Dec. 14, 2000) [coverage of contraception] <http://eeoc.gov/policy/docs/decision-contraception.html> [as of Mar. 1, 2004]; Conn. Gen. Stat., § 38a-503e (2001) [mandating insurance coverage of prescription contraception]; Mass. Gen. Laws, ch. 176B, § 4W(b) (2002) [same]; Vt. Stat. Ann., tit. 8, § 4099c (2000) [same].)

Neither the propriety, nor the wisdom of, nor the government's authority to impose a prescription contraceptive mandate on California employers is at issue here. The question is a very narrow one. May the government impose a mandate on a religiously affiliated employer that requires the employer to pay for contraceptives—in violation of an acknowledged religious tenet—or to

redefine what constitutes religious conduct?[1] While antidiscrimination laws reflect a constitutional value, religious liberty occupies a commensurate level in the constitutional hierarchy. As often happens with First Amendment cases, this is "a collision between two interests of the highest order: the Government's interest in eradicating discrimination in employment and the constitutional right of a church to manage its own affairs free from governmental interference." (*E.E.O.C. v. Catholic University. of America* (D.C. Cir. 1996) 317 U.S. App. D.C. 343 [83 F.3d 455, 460] (*Catholic University*).) Thus, the desire to prevent discrimination cannot be the beginning and the end of the discussion.

## A. Why Religious Liberty Is Important

A strong argument can be made that it was the primacy of religious liberty in the early history of this country, with its acknowledgment of the separate spheres of church and state, that gave rise to our notions of limited government and equal protection—the constitutional precursors of our antidiscrimination laws. (McConnell, *Why Is Religious Liberty the "First Freedom"?* (2000) 21 Cardozo L.Rev. 1243, 1244 ["the division between temporal and spiritual authority gave rise to the most fundamental features of liberal democratic order: the idea of limited government, the idea of individual conscience and hence of individual rights, and the idea of civil society, as apart from government, bearing primary responsibility for the formation and transmission of opinions and ideas"].)

Our ability to create a space for religious perspectives is both instrumental and regenerative for democracy. Religious institutions enhance individual autonomy "by challenging the sovereign power of the liberal state" (Noonan, *The End of Free Exercise?* (1992) 42 De Paul L.R. 567, 579–580) and by articulating alternative visions—"counter-cultural visions that challenge and push the larger community in . . . directions unimagined by prevailing beliefs." (Brady, *Religious Organizations and Mandatory Collective Bargaining Under Federal and State Labor Laws: Freedom From and Freedom For* (2004) 49 Vill. L.Rev. 77, 156.) By protecting religious groups from gratuitous state interference, we convey broad benefits on individuals and society. By underestimating the transformative potential of religious organizations, we impoverish our political discourse and imperil the foundations of liberal democracy.

---

[1] The question has to be stated in the alternative because the California enactment has some peculiarities. Despite the state's argument that it has a compelling interest in ensuring that all working women who desire prescription contraceptive coverage have that option available, the mandate is imposed only on employers that provide prescription coverage. Thus, Catholic Charities of Sacramento, Inc. (Catholic Charities), can choose either to provide contraceptives or not to provide prescription coverage to employees at all. This option would arguably make everyone worse off, but, in theory at least, equally so.

### B. *Does Smith Apply to Religious Organizations?*

Despite its surface simplicity, *Smith* is not an easy case to understand or apply. The majority correctly quotes the critical passages from *Smith*: " '[T]he right of free exercise does not relieve an *individual* of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." ' (*Smith*, [*supra*, 494 U.S.] at p. 879, quoting *United States v. Lee* [(1982)] 455 U.S. 252, 263, fn. 3 [71 L.Ed.2d 127, 102 S.Ct. 1051] (conc. opn. of Stevens, J.).) To permit religious beliefs to excuse acts contrary to law, the *Smith* court reasoned, ' "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit *every citizen* to become a law unto *himself.*" ' (*Smith*, at p. 879, quoting *Reynolds v. United States* (1879) 98 U.S. 145, 167 [25 L.Ed. 244].)" (Maj. opn., *ante*, at p. 548, italics added.)

Since *Smith* focused exclusively on the individual's free exercise of religion, some courts have reasoned that religious institutions are exempted entirely from the *Smith* analysis. (*Gellington v. Christian Methodist Episcopal Church* (11th Cir. 2000) 203 F.3d 1299, 1303; see Kaplan, *The Devil Is in the Details: Neutral, Generally Applicable Laws and Exceptions from Smith* (2000) 75 N.Y.U. L.Rev. 1045, 1070.)

#### 1. *Individuals v. Institutions*

This case involves a religious organization and not an individual. Perhaps more importantly, it does not deal with the denial of a benefit because of a violation of existing law. Rather, it attempts to assess the constitutional implications of a law that requires a religious organization to provide a benefit despite its theological objections. These fundamental differences are simply ignored in the majority's analysis.

Under *Smith*, the right of free exercise does not relieve an *individual* of the obligation to comply with a valid and neutral law of general applicability even if the law requires conduct that contravenes a religious belief, but "[i]t does not follow . . . that *Smith* stands for the proposition that a *church* may never be relieved from such an obligation." (*Catholic University, supra*, 83 F.3d at p. 462.)

The majority may have made an abortive attempt to deal with this obvious distinction by citing, and dismissing, the so-called ministerial exception. It is true, as the majority notes, that the ministerial exception is not directly at issue here. (See, e.g., *Alicea-Hernandez v. Catholic Bishop of Chicago* (7th Cir. 2003) 320 F.3d 698 [ministerial exception to title VII]; *E.E.O.C. v.*

*Roman Catholic Diocese of Raleigh, NC* (4th Cir. 2000) 213 F.3d 795 [same]; *Combs v. Cen. Tx. Ann. Conf. United Methodist Church* (5th Cir. 1999) 173 F.3d 343 [same].) Likewise, it is certainly debatable whether the legislative action challenged here invades the narrow domain labeled church autonomy. (See, e.g., *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d 151, 96 S.Ct. 2372] [state court impermissibly encroached on church autonomy]; *Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94 [97 L.Ed. 120, 73 S.Ct. 143] [state statute impermissibly encroached on church autonomy].) And yet, the logic of these cases suggests that the constitutionally protected space for religious organizations is actually broader than these obvious categories. In short, the ministerial exception and the church autonomy doctrine are ways of describing spheres of constitutionally required protection, but these categories are not exhaustive.

The court in *Catholic University* summarized the distinction it was making this way: "We conclude from our review of the Supreme Court's First Amendment jurisprudence that whereas the Free Exercise Clause guarantees a church's freedom to decide how it will govern itself, what it will teach, and to whom it will entrust its ministerial responsibilities, it does *not* guarantee the right of its members to practice what their church may preach if that practice is forbidden by a neutral law of general application." (*Catholic University, supra*, 83 F.3d at p. 463.) In fact, the Legislature apparently takes a similar view of the breadth of *Smith* because it provided an exemption from the WCEA for churches.

### 2. The Two Faces of Entanglement

Under venerable establishment clause precedent, however, the exemption itself is problematic. To put it bluntly, the government may generally separate the religious from the secular to decide how it will dispense its benefits, but it cannot parse a bona fide religious organization into "secular" and "religious" components solely to impose burdens on the secular portion.

As noted, *ante*, the constitutional basis for the distinction seems indisputable. The United States Supreme Court has recognized that government action may burden the free exercise of religion in two different ways: "by interfering with a believer's ability to observe the commands or practices of his faith [citations], and by encroaching on the ability of a church to manage its internal affairs." (*Catholic University, supra*, 83 F.3d at p. 460; see, e.g., *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah* (1993) 508 U.S. 520, 531–533 [124 L.Ed.2d 472, 113 S.Ct. 2217] (*Lukumi*); *Kedroff v. St. Nicholas Cathedral, supra*, 344 U.S. at p. 116 [free exercise clause protects power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"].)

If Catholic Charities were a "religious employer" it would be exempt from the WCEA's requirement to include coverage for contraceptives in its group health care policy. Under the act, a religious employer must satisfy all of the following criteria: "(A) The inculcation of religious values is the purpose of the entity. [¶] (B) The entity primarily employs persons who share the religious tenets of the entity. [¶] (C) The entity serves primarily persons who share the religious tenets of the entity. [¶] (D) The entity is a nonprofit organization as described in Section 6033(a)(2)(A)i or iii, of the Internal Revenue Code of 1986, as amended." (Health & Saf. Code, § 1367.25, subd. (b)(1).)

As the majority notes, "Catholic Charities does not qualify as a 'religious employer' *under the WCEA* because it does not meet any of the definition's four criteria." (Maj. opn., *ante*, at p. 539, italics added.) But Catholic Charities would be a religious employer if the Legislature had not designed the exemption narrowly enough to exclude it.[2] The plaintiffs contend the Legislature has "deliberately defined the Catholic Church in a manner entirely inconsistent with Catholic religious teaching, to exclude critical, constitutive elements of the Catholic Church—i.e., the Church's health care, social service and educational ministries—from the definition of 'religious employer' included in the exemption provisions."

The high court " 'has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' " (*Corporation of Presiding Bishop v. Amos* (1987) 483 U.S. 327, 334 [97 L.Ed.2d 273, 107 S.Ct. 2862] (*Amos*).) At the same time, acknowledging that churches often regard the community services provided by affiliated nonprofits as "a means of fulfilling religious duty and of providing an example of the way of life a church seeks to foster" (*id.* at p. 344 (conc. opn. of Brennan, J.)), the court concluded the case-by-case determination of whether an affiliated nonprofit is religious or secular is inappropriate under the free exercise clause. (*Id.* at pp. 341–342 (conc. opn. of Brennan, J.) ["Religion includes important communal elements for most believers. They exercise their religion through religious organizations and these organizations must be protected by the [Free Exercise] Clause. . . . [R]eligious activity derives meaning in large measure from participation in a larger religious community"].)

Even after *Smith*, it seems quite clear the government may not discriminate among religions (*Larson v. Valente* (1982) 456 U.S. 228, 253 [72 L.Ed.2d 33,

---

[2] Earlier versions of the WCEA contained a broader concience clause—which Catholic Charities deemed acceptable—exempting bona fide religious employers and allowing religiously affilated hospitals, universities, and social service agencies to opt out. The current version of the act exempts churches, synagogues, mosques, temples, missions, parochial schools, seminaries and convents from the requirements to provede contraceptive coverage.

102 S.Ct. 1673]) or engender a risk of politicizing religion (*id.* at pp. 253–254) or purport to exempt "religious" but not "secular" activities (*Cantwell v. Connecticut* (1940) 310 U.S. 296, 301 [84 L.Ed. 1213, 60 S.Ct. 900]; *Espinosa v. Rusk* (10th Cir. 1980) 634 F.2d 477, 480–481, affd. (1982) 456 U.S. 951 [72 L.Ed.2d 477, 102 S.Ct. 2025]). In *NLRB v. Catholic Bishop of Chicago* (1979) 440 U.S. 490 [59 L.Ed.2d 533, 99 S.Ct. 1313] (*Catholic Bishop*), the National Labor Relations Board (NLRB) certified unions as bargaining agents for lay teachers in church-affiliated schools. The NLRB asserted it was required to decline jurisdiction only when schools were" 'completely religious' " and not just " 'religiously associated.' " (*Id.* at p. 493.) The Seventh Circuit Court of Appeals rejected the NLRB's standard as a " 'simplistic black or white, purported rule' " which offered no guide to discretion. (*Id.* at p. 495.) " 'The real difficulty is found in the chilling aspect that the requirement of bargaining will impose on the exercise of the bishops' control of the religious mission of the schools.' " (*Id.* at p. 496.) The Supreme Court, after acknowledging that the NLRB's attempt to distinguish between " 'completely religious' " and " 'religiously associated' " was a recognition of its intrusion into areas protected by the religion clauses, construed the National Labor Relations Act so as to avoid deciding whether jurisdiction "was constitutionally permissible under the Religion Clauses of the First Amendment." (*Catholic Bishop*, at p. 499.) Nevertheless, the court expressed concern that NLRB jurisdiction would inevitably involve "inquiry into the good faith of the position asserted by clergy-administrators and its relationship to the school's religious mission," and the "very process of inquiry" would impinge on rights guaranteed by the religion clauses. (*Catholic Bishop*, at p. 502.)

In *Universidad Cent. de Bayamón v. N.L.R.B.* (1st Cir. 1985) 793 F.2d 383, 387, the NLRB sought to avoid the problem by exempting " 'pervasively sectarian' " schools. The controlling opinion in *Universidad Cent. de Bayamon* found board jurisdiction posed just as great a risk as the Supreme Court envisioned in *Catholic Bishop, supra,* 440 U.S. 490. "For the Board to exercise jurisdiction over an educational institution where 'the inculcation of religious values is at least *one* purpose of the institution' and 'to promise that courts in the future will control the Board's efforts to examine religious matters, is to tread the path that *Catholic Bishop* forecloses.' " (*University of Great Falls v. N.L.R.B.* (D.C. Cir. 2002) 349 U.S. App. D.C. 386 [278 F.3d 1335, 1342] (*Great Falls*), quoting *Universidad Cent. de Bayamon v. N.L.R.B.,* at p. 402.)

In *Great Falls,* the Court of Appeals for the District of Columbia rejected the NLRB's latest effort—the "substantial religious character" test—because the multifaceted analysis created the same concerns as the approach rejected in *Catholic Bishop.* Moreover, the court invoked a long line of precedents

which have made it clear that religious tests, inquiries into religious perspectives, or generally trolling through a person's or institution's religious beliefs is " 'not only unnecessary but also offensive.' " (*Great Falls, supra,* 278 F.3d at pp. 1341–1342, quoting *Mitchell v. Helms* (2000) 530 U.S. 793, 828 [147 L.Ed.2d 660, 120 S.Ct. 2530]; *Amos, supra,* 483 U.S. 327, 340, 345 (conc. opn. of Brennan, J.).)

The court in *Great Falls* thus suggested a broad exemption which would avoid the pitfalls of having the government determine what is religious or how much religion is sufficient. The court would exempt any school which purports to provide a religious environment; is organized as a nonprofit; and affiliated with, or owned, or operated, or controlled directly or indirectly by a recognized religious organization or entity whose membership is determined at least in part with reference to religion. (*Great Falls, supra,* 278 F.3d at p. 1343.) The point of this bright-line test was to avoid delving into religious doctrine or motive and to avoid coercing a religiously affiliated educational institution to alter its religious mission to meet regulatory demands. (*Id.* at p. 1345.) This approach responds to a long-standing concern that the religious liberty protected by the Constitution ought not to depend on a "determination by state authority as to what is a religious cause." (*Cantwell v. State of Connecticut, supra,* 310 U.S. at p. 307.)

Of course, the cited cases are distinguishable. The controversy here does not involve solicitation, or potential chilling effects, religious schools, administrative discretion, or ad hoc determinations. In reality, this case is worse. Here we are dealing with an intentional, purposeful intrusion into a religious organization's expression of its religious tenets and sense of mission. The government is not accidentally or incidentally interfering with religious practice; it is doing so willfully by making a judgment about what is or is not religious. This is precisely the sort of behavior that has been condemned in every other context. The conduct is hardly less offensive because it is codified. Definition may be just as pernicious as ongoing monitoring if its purpose is to suppress or burden religious conduct. (*Espinosa v. Rusk, supra,* 634 F.2d at p. 481 ["The conception of religion entertained by the City . . . was that it had to be purely spiritual or evangelical. Thus, the charitable activity of the church having to do with the feeding of the hungry or the offer of clothing and shelter to the poor was deemed subject to regulation. This broad definition of secular is part of the problem"].)

### 3. *The Meaning of Neutrality*

In theory, when religious liberties are at stake, the state is only neutral when it does not choose sides. (Laycock, *Religious Liberty as Liberty* (1996) 7 J. Contemp. Legal Issues 313 ["[T]he core point of religious liberty is that

the government does not take positions on religious questions—not in its daily administration, not in its laws, and not in its Constitution either"].) This would mean that the state may not prefer or seek to impose a particular normative view by squelching a competing religious perspective. Genuine neutrality would "allow many different and contending voices to be represented in public discourse." (McConnell, *Why Is Religious Liberty the "First Freedom"?*, *supra*, 21 Cardozo L.Rev. at p. 1262.)

In the present controversy, one side posits that sex is an aspect of autonomy, a vital human function in which men and women should be able to engage, enjoying their sexuality "free from anxiety." (Hayden, *Gender Discrimination Within the Reproductive Health Care System: Viagra v. Birth Control* (1999) 13 J.L. & Health 171, 181.) This may in fact be the view of a majority of American adults. The Catholic Church's view, in contrast, deems all forms of nonmarital sex immoral, and views sex within marriage as a unitive, procreative, and sacred reflection of a spiritual, emotional, and biological reality that comes complete with reproductive anxiety. (See George & Bradley, *Marriage and the Liberal Imagination* (1995) 84 Geo. L.J. 301–320.) This is a perspective many people would disparage as archaic. Several of the legislators debating the WCEA seemed to think so.[3]

The Catholic Church purports to be one of those different and contending voices, a church which "has never envisioned a sharp divide between the Church and the world, the spiritual and the temporal, or religion and politics. For the Church, the internal spiritual life of its members and institutions must always move outward as a sign and instrument for the transformation of the larger society." (Brady, *Religious Organizations and Mandatory Collective Bargaining Under Federal and State Labor Laws: Freedom From and Freedom For*, *supra*, 49 Vill. L.Rev. at p. 157.)

Petitioner complains the narrow exemption was designed to lend the state's "considerable weight to the dissenting side of a conflict within the church about the legitimacy of contraceptive practice—under the banner of protecting the 'rights' of those who disagree . . . and to deny the church exemption based on the allegedly unpopular nature of a church doctrine that diverges

---

[3] (See, e.g., Remarks of Sen. Speier, Sen. Floor Debate on Sen. Bill No. 41 (1999–2000 Reg. Sess.) Apr. 12, 1999, pp. 7–8 [floor statement of Senator Speier asserting that since 75 percent of all California Catholic hospitals already provide contraception coverage, the "issue has already been resolved . . . and its time has come"]; Remarks of Sen. Speier, Sen. Floor Debate on Assem. Bill No. 39 (1999–2000 Reg. Sess.) Sept. 7, 1999, p. 7 [floor statement of Senator Speier arguing that "59 percent of all Catholic women of childbearing age practice contraception [and] 88 percent of Catholics believe . . . that someone who practices artificial birth control can still be a good Catholic," and commenting, "I agree with that. I think it's time to do the *right thing*" (italics added)].)

from contemporary cultural mores." In petitioner's words, the state's "action has the effect of declaring the Catholic hierarchy's stand 'heresy' in the eyes of secular culture."

Of course, practice always diverges from theory. In contemporary American society, the government does take sides on policy issues. The First Amendment precludes the government from taking sides if the dispute involves internal church governance, but that leaves an area of overlap where the religiously dictated conduct of churches operating in the world comes into conflict with public policy. The question then is whether the coercive force of the law may be brought to bear to compel a religious organization that holds an alternative view, based on religious scruples, to support a hostile and competing vision of the good.

### a. *Religious bigotry*

*Smith* could be read, as the majority apparently reads it, to suggest that religion is not entitled to constitutional protection unless the government action expressly and specifically targets religious expression. Under this interpretation, protection for religious liberty requires proof of religious bigotry, i.e., proof that government officials acted out of antireligious motives. Thus, *Smith*—even as modified by *Lukumi*—would prohibit infringements of religious liberties only if a statute has the "object or purpose of . . . suppress[ing] religion or religious conduct" or involves "[o]fficial action that targets religious conduct for distinctive treatment." (*Lukumi, supra,* 508 U.S. at pp. 533–534.) Since this statute imposes a mandate on all employers that provide prescription coverage, it arguably does not target religious conduct. On one level, religious interests and secular interests are treated with equal dignity, and since the mandate provides an escape hatch, Catholic Charities' attempt to claim specifically unequal treatment faces formidable obstacles. Consequently, the majority finds Catholic Charities has failed to prove an antireligious motive and the statute is neutral.

### b. *Objects and effect*

There is, however, more than one way to look at neutrality. As *Lukumi* explains it, "[f]acial neutrality is not determinative. . . . The [free exercise] clause 'forbids subtle departures from neutrality' [citation] and 'covert suppression of particular religious beliefs.' " (*Lukumi, supra,* 508 U.S. at p. 543.) "Apart from the text, the effect of a law in its real operation is strong evidence of its object." (*Id.* at p. 535.) "[I]f the object of the law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral [citation]; and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." (*Id.* at p. 533.) "The

Free Exercise Clause 'protect[s] religious observers against unequal treatment.' " (*Lukumi*, at p. 542.) But equality in the context of religious liberty must be broadly defined. In effect, the general applicability requirement is needed to ensure neutrality across broad categories of regulation. Pursuant to *Lukumi*, if other activities which cause comparable harm to the same governmental interests are not regulated, the law is not generally applicable. Thus, *Lukumi* makes it clear that strict scrutiny is required if a law is not neutral—and it considers the question of neutrality broadly.

In this case, for instance, defendants argue that Catholic Charities' ability to opt out, i.e., to choose not to provide any prescription coverage, obviates any concern about infringement. Catholic Charities insists it should not be forced to relinquish its vision of appropriate employee relations to preserve its right to object to the use of contraceptives. From the Church's perspective, to demand that contraception be funded, despite bona fide religious objections, is to take sides, to abandon the commitment to public neutrality. In this sense, the WCEA, with its grudging religious exemption, may not be neutral. The majority's response that the WCEA's narrow exemption is an accommodation and not an imposition seems entirely unresponsive.

In the whole scheme of things, the risk associated with allowing government to impose a stifling orthodoxy in pursuit of the good society may greatly outweigh the small harm of tolerating heterodoxy in this circumstance.[4] At oral argument, counsel indicated the Catholic Church, including Catholic Charities, employs fewer than 60,000 of California's millions of employees.[5] Some of the Church's employees belong to religious orders and are presumably fully in agreement with the church's position. Some are men,

---

[4] This does not mean that the government may never limit what religious organizations can do. There are truly neutral laws which may be applied; there are aggressive interventions which are necessary to prevent harm. (See, e.g., *Walker v. Superior Court* (1988) 47 Cal.3d 112, 139 [253 Cal.Rptr. 1, 763 P.2d 852] [finding Christian Scientist who did not seek medical treatment for her child liable for child's death, notwithstanding the "religious infringement of significant dimensions," since state's interest is compelling and child endangerment statute is narrowly tailored]; Brady, *Religious Organizations and Mandatory Collective Bargaining Under Federal and State Labor Laws: Freedom From and Freedom For, supra*, 49 Vill. L.Rev. at p. 161 ["In rare cases, limitations on the freedom of religious organizations may be necessary. For example, if a religious group experiments with practices that endanger the lives of its employees or threaten them with serious bodily injury, interference may be justified"]; Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy* (1981) 81 Colum. L.Rev. 1373, 1406 ["Courts have intervened to protect church members from serious bodily harm even when they voluntarily submitted"].) In contrast, what this case presents is essentially a clash of ideas.

[5] These numbers are approximate. At oral argument, Catholic Charities counsel asserted that the Catholic Church employs fewer than 50,000 people, including those in holy orders. Proponents claim there are 52,000 employees in Catholic-affiliated hospitals alone. Using 60,000 as a point of reference, it appears all Catholic Church employees in California represent less than .5 percent of the California workforce, and female employees of the Catholic Church

some are women no longer capable of childbearing, and some are spouses of people employed by other companies who are covered by their spouses' health plans. Of the women of childbearing age who remain, and to whom contraceptive coverage is a critical concern, none are faced with a pervasive practice which would prevent them from finding more congenial employment.[6] The existence of WCEA's mandate—to which the vast majority of California employers apparently have no religious objection—enhances their employment options. In fact, the defection of talented female employees may cause Catholic Charities to reconsider its position. Such a result has no First Amendment implications.

A substantial amount of federal case law supports Catholic Charities' claim that the Legislature's attempt to draw distinctions between the religious and secular activities of a single religious entity is an impermissible government entanglement in religion. I am inclined to agree. Such an action is constitutionally invalid, and that ends the discussion. If, however, the existence of the narrow exemption simply shows the statutory scheme is not neutral in operation or effect, it is invalid only if it fails strict scrutiny.

---

represent about the same percentage of the number of working women of childbearing age in California. According to recent Bureau of Labor Statistics publications, the current number of California adults employed in nonfarm jobs is approximately 14.4 million. (Bur. of Lab. Statistics, U.S. Dept. of Lab. News Release No. 04-81 (Jan. 27, 2004) Employees on nonfarm payrolls by state and selected industry sector, table 5 <http://www.bls.gov/news.release/pdf/laus.pdf> [as of Mar. 1, 2004].) A little less than half are women. Extrapolating from national statistics, around 5 million of that total will be women between 16 and 45. (Bur. of Lab. Statistics, U.S. Dept. of Lab. News Release No. 04-120 (Feb. 6, 2004) Selected employment indicators, table A-6 <http://www.bls.gov/newsrelease/pdf/empsit.pdf> [as of Mar. 1, 2004].) Even assuming these numbers need to be adjusted upward or downward for accuracy, an exemption for Catholic Charities would seem to have a negligible effect.

[6] The majority cites language from *United States v. Lee, supra,* 455 U.S. 252, for the proposition that allowing an employer to be exempt from a neutral law "operates to impose the employer's religious faith on the employees." (*Id.* at p. 261.) This is a curious statement. In *Lee,* both the employer and the employee were members of the Old Order Amish and all agreed they should be exempt from Social Security and unemployment insurance taxes. Even if that were not the case, it is not clear how an employer is in a position to impose anything on its employees to which they object. (U.S. Const., 13th Amend. [prohibiting slavery or involuntary servitude].) Only the state, which holds the monopoly on coercive force, can compel adults to remain where they do not choose to be and do what they do not wish to do.

In *Smith v. FEHC, supra,* 12 Cal.4th 1143, this court considered whether a state law prohibiting discrimination against unmarried cohabiting couples burdened the free exercise of a landlady who objected to renting to the couple on religious grounds. A majority of the court concluded Smith's rights were not substantially burdened because she could simply abandon the rental business and redeploy her capital. If we reject the challenges of some religious claimants because they have other options, what logic compels us to assume that employees have no choice?

## C. *Strict Scrutiny*

Strict scrutiny is not what it once was. Described in the past as "strict in theory and fatal in fact" (Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection* (1972) 86 Harv. L.Rev. 1, 8), it has mellowed in recent decades (see, e.g., *Grutter v. Bollinger* (2003) 539 U.S. 306 [123 S.Ct. 2325, 2338, 156 L.Ed.2d 304] [holding state law school's race-based affirmative action program survived strict scrutiny and noting that "[s]trict scrutiny is not 'strict in theory, but fatal in fact' "]).

If recent precedent is any guide, a state's interest is compelling if the state says it is. Thus, consistent with federal precedent, compelling interest now seems more or less coextensive with the state's asserted exercise of police power.

### 1. *Compelling State Interest*

Unquestionably, the desire to eradicate invidious discrimination is a compelling state interest. But is the desire to force conformity on a single employer that objects to contraception on religious grounds also a compelling state interest? In the latter case, the state is not dealing with invidious discrimination; it is trying to prevent a disparate impact. Catholic Charities does not discriminate because of an animus against women. It opposes all forms of birth control, except abstinence, whether for men or women, whether prescription or over-the-counter, whether surgical, oral, or mechanical.

### 2. *Narrow Tailoring*

The WCEA defines as religious only those organizations for which the inculcation of religious values is the sole purpose of the entity, that primarily employ only adherents of their own faith tradition, that primarily serve only people who share their religious tenets, and that qualify as nonprofit organizations described in section 6033(a)(2)(A)(i) or (iii) of the Internal Revenue Code of 1986.

This is such a crabbed and constricted view of religion that it would define the ministry of Jesus Christ as a secular activity.[7] The stinginess of the

---

[7] Even churches that do not operate schools, hospitals, or social service agencies would have trouble with the WCEA's religious test. Not all religions proselytize. Those that do necessarily reach out to people who do not share their beliefs. Christian denominations, for example, are commanded to seek and save the lost. "Go ye into all the world and teach the gospel to every creature." (Mark 15:15.) Catholic Charities suggest that some Catholic congregations might be "ineligible for the exemption depending . . . upon the demographics of a particular diocese, the·

exemption makes the structure of the act all the more baffling. The mandate applies only to employers that provide prescription coverage. Thus, Catholic Charities can avoid the mandate by dropping the coverage. The state wants to make sure that women are not burdened more than others. Where employers cooperate, the WCEA will reduce the inequitable financial burden of healthcare for women. If religiously affiliated employers are serious about their objections, however, women who work for those employers could actually be worse off.

The only reasons given for narrowing the exemption so drastically is the alleged concern that the exception could "swallow up" the rule because the numbers of employees who work for *secular organizations* affiliated with religious entities could easily approach several hundred thousand; the exemption might deprive thousands of employees of access to nondiscriminatory health and disability insurance; and a desire exists to extend coverage to as many people as possible. There are a few problems with this litany. First, the act, as its structure demonstrates and as the majority candidly admits, has nothing to do with access or extending coverage. "[T]he principal purpose of the WCEA . . . is not to facilitate access to contraceptives but to eliminate a form of gender discrimination in the provision of health benefits." (Maj. opn., *ante*, at p. 566.) Moreover, the record provides no support for the claim that the exemption potentially affects several hundred thousand employees.

Furthermore, employers have the option of self-insuring. The Employee Retirement Income Security Act preempts state regulation of self-insured companies and "prohibits states from mandating benefits or defining discrimination in self-insured employee benefit plans more broadly than federal law." (Law, *Sex Discrimination and Insurance for Contraception* (1998) 73 Wash. L.Rev. 363, 395; 29 U.S.C. § 1001 et seq.) Such employers would not only not be subject to mandatory prescription coverage, they would not be subject to *any* of California's more restrictive insurance regulations. Arguably, the existence of these secular exemptions supports a religiously-affiliated-employer exemption even under *Smith.* The state would also need to show its refusal to countenance a religious exception, in a regulatory arena rife with exceptions, is not "official action that targets religious conduct for distinctive treatment." (*Lukumi, supra,* 508 U.S. at pp. 533–534.)

## II.

Thus, whether the WCEA would survive strict scrutiny—even under the relaxed federal standard—seems a much closer question than the majority

---

fortuitous nature of hiring patterns, and the particular application of the theological criteria . . . ."

acknowledges. But there may be other good reasons to rely on independent state grounds. Changes in the interpretation of the federal charter are not only becoming more frequent, the balancing test, and the standards applied to them, are shifting. Instead of applying *Smith*, we might view it as effectively returning free exercise questions to the states.

## A. *A Document of Independent Force*

"We may take it for granted that the meaning of California Constitution article I, section 4, . . . is not dependent on the meaning of any provision of the federal Constitution. The state charter declares in so many words that '[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution.' (Cal. Const., art. I, § 24.)" (*Smith v. FEHC, supra*, 12 Cal.4th at p. 1177.) "Respect for our Constitution as 'a document of independent force' [citation] forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter." (*People v. Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108], quoting *People v. Brisendine* (1975) 13 Cal.3d 528, 549–550 [119 Cal.Rptr. 315, 531 P.2d 1099].)

This is true even when the language is identical to the federal Constitution, but is particularly true when the language differs. (See, e.g., *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1019 [111 Cal.Rptr.2d 336, 29 P.3d 797] ["Unlike the United States Constitution, which couches the right to free speech as a limit on congressional power (see U.S. Const., 1st Amend.), the California Constitution gives '[e]very person' an affirmative right to free speech. [Citation.] Accordingly, we have held that our free speech clause is 'more definitive and inclusive than the First Amendment' " (fn. omitted)].)

Similarly, although we have said California's establishment clause is coextensive with the federal provision (*East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 718 [102 Cal.Rptr.2d 280, 13 P.3d 1122]), California's free exercise clause *guarantees* "free exercise and enjoyment of religion without discrimination or preference" and specifies that "liberty of conscience does not excuse acts that are licentious or inconsistent with the peace and safety of the state." (Cal. Const., art. I, § 4.) We do not have to ·decide that this language literally embodies the strict scrutiny test. The drafting history of California's free exercise clause is not clear enough to resolve the question definitively. Although the proponents of the licentious acts clause may simply have wanted to preserve the ability of the state to regulate specific practices they considered immoral or dangerous (Browne, Rep. of the Debates in Convention of Cal. on Formation of State Const. (1850) p. 39), that does not mean they thought the language was otherwise synonymous with the language of the federal Constitution.

## B. *The Compelling State Interest Analysis*

The majority carefully avoids deciding whether strict scrutiny would be required under the California Constitution. Other states with very similar constitutional liberty of conscience clauses have found that infringement requires strict scrutiny. (See, e.g., *Humphrey v. Lane* (2000) 89 OhioSt.3d 62 [2000 Ohio 435, 728 N.E.2d 1039, 1043] [holding that under the Ohio Constitution, "the standard for reviewing a generally applicable, religion-neutral state regulation that allegedly violates a person's right to free exercise of religion is whether the regulation serves a compelling state interest and is the least restrictive means of furthering that interest" and finding the regulation at bar not the least restrictive]; *State v. Hershberger* (Minn. 1990) 462 N.W.2d 393 [under the Minnesota Constitution, neutral motor vehicle statute, which burdened Amish religious exercise, failed compelling state interest test since state failed to show lack of reasonable alternative means]; *First Covenant Church v. City of Seattle* (1992) 120 Wn.2d 203 [840 P.2d 174, 187] [statute that burdened free exercise failed state compelling interest test under Washington Constitution since the state's interest was not of sufficient magnitude to outweigh free exercise of religion].)

At the very least, the constitutional weight of the state's interest must be affected by the size and severity of the problem the state is attempting to solve. To authorize the state to use a howitzer to smite a gnat should be no part of our constitutional jurisprudence. Where strict scrutiny applies, the state "may abridge religious practices only upon a demonstration that some compelling state interest *outweighs* the defendants' interests in religious freedom." (*People v. Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 394 P.2d 813] (*Woody*).)

It may also be true that "[s]ection 4 has not played an independent role in free exercise claims" (Grodin et al., The Cal. State Constitution: A Reference Guide (1993) p. 44), but does that mean it should remain dormant? In *Woody*, the court relied on the First Amendment rather than the California provision, but in doing so, the court applied strict scrutiny and insisted on a searching inquiry. Under California law—at least up to now—the compelling state interest test had bite and required the court to "weigh[] the competing values represented . . . on the symbolic scale of constitutionality." (*Woody, supra*, 61 Cal.2d at p. 727.) Untested assertions of a possible deleterious effect on a statutory scheme were not sufficient. (*Id.* at p. 724.) In *Woody*, the court concluded that uniform enforcement of neutral criminal drug laws (similar to the laws at issue in *Smith*) was not a compelling reason to intrude upon sincere religious practices. In explaining why the interest in drug enforcement—while undeniably important—was not compelling enough, the court said: "In a mass society, which presses at every point toward conformity, the

protection of self-expression, however unique, of the individual and the group becomes ever more important. The varying currents of the subcultures that flow into the mainstream of our national life give it depth and beauty." (*Woody*, at p. 727.) These concerns should be heightened when the government seeks to redefine the core theology of religious organizations.

Under the standard enunciated in *Woody*, the state has actually failed to meet its burden. The whole debate ensues because the state found that "approximately 10 percent of commercially insured Californians did not have coverage for prescription contraceptives." (Maj. opn., *ante*, at p. 537.) Presumably that 10 percent includes both men and women. Still, it means that 90 percent of Californians who are commercially insured do have such coverage! The insurance gap itself is not large, and Catholic Church employers can constitute only a small percentage of that small percentage.

Moreover, even if we assume the interests at issue here are both compelling and of equal weight, the Legislature's refusal to grant a broader exemption—one which would not embroil the government in the unseemly task of deciding what is "religious"—is inexplicable. The state has produced no substantial evidence that the exemption of Catholic Charities from this particular mandate would render the whole scheme ineffective or would be so administratively burdensome as to preclude enforcement. As petitioner poses the question: "[I]f closing the Catholic gap [was] not the problem," how can " 'granting an exemption to Catholic employers' . . . 'defeat the purpose of the bill' "? There has been no showing that the interests served by the WCEA—which focuses on a modest 10 percent gap in coverage—cannot be achieved by less restrictive means.

CONCLUSION

Equality is one of those words, like justice, like freedom, which no one is against. But the invocation of the word "equality" often reduces analysis to empty platitudes. It is important to remember that in America we seek equality because it is a concomitant of freedom. When it is possible to accommodate both, that is what we should do.